Waymon POWELL, Claudell Smith, Willie Griffin, Hershel Ward and Odell Lawson, Plaintiffs,

v.

GEORGIA PACIFIC CORPORATION: International Woodworkers of America, AFL–CIO: and Local 5–475, International Woodworkers of America, Defendants.

INTERNATIONAL WOODWORKERS OF AMERICA, AFL–CIO, and its Local 5–475 Plaintiffs,

v.

GEORGIA PACIFIC CORPORATION, Defendant.

Nos. ED–73–C–1, ED–73–C–3.

United States District Court, W. D. Arkansas, El Dorado Division.

Memorandum Opinion Oct. 23, 1980.

On Motion to Alter or Modify Opinion Dec. 19, 1980.

On Time Limitations and Type of Hearing March 17, 1982.

**716**

Perlesta A. Hollingsworth, P.A., John W. Walker, P.A., Little Rock, Ark., Jack Greenberg, Ronald L. Ellis, New York City, for individual plaintiffs.

Youngdahl & Larrison, James E. Youngdahl, Lynn-Marie Crider, Little Rock, Ark., for IWA and its local.

Wright, Lindsey & Jennings, Robert S. Lindsey, Little Rock, Ark., Elarbee, Clark & Paul, J. Lewis Sapp, Atlanta, Ga., for Georgia-Pacific Corp. defendant.

## MEMORANDUM OPINION

OREN HARRIS, District Judge.

Waymon Powell, Claudell Smith, Willie Griffin, Hershel Ward and Odell Lawson initiated this action alleging that they represent a class of black employees and applicants for employment at the facilities of Georgia-Pacific Corporation at Crossett, Arkansas, who have suffered racial discrimination in employment and employment decisions. International Woodworkers of America, AFL–CIO, CLC, and its Local 5–475, have filed a separate action making similar allegations on behalf of certain black employees at the facilities.

The Court conditionally certified the individual black plaintiffs as representatives of a class composed of those black persons who are employed, have been employed, have sought employment, and who might seek employment in the plywood operations carried on by Georgia-Pacific Corporation at its facilities in Crossett, Arkansas, by Order of March 3, 1977. By Order of May 5, 1978, the International Woodworkers of America, AFL–CIO, CLC, and its Local 5–475 were joined as a plaintiff for purposes of maintaining representational claims on behalf of its members, but not as class representatives under Rule 23.

After extended discovery and pre-trial proceedings, the matter came on for trial pursuant to the regular schedule of the Court, the hearing commencing on July 10, 1978, and the final day of testimony being September 14, 1978. After the parties had rested, the matter was taken under advisement by the Court pending preparation of the extensive transcript and submission by counsel of proposed findings and conclusions and arguments and briefs in support thereof. All proposed findings and conclusions and arguments and briefs of counsel in support thereof have now been filed and the matter is submitted to the Court for determination of the issues, without the intervention of a jury.

From the pleadings, the testimony and exhibits received in evidence, and in consideration of the proposed findings and conclusions and the argument and briefs presented in support thereof by counsel, the Court makes the following findings of fact and conclusions of law, which are incorporated herein pursuant to Rule 52, Federal Rules of Civil Procedure:

The individual plaintiffs are black citizens of the United States and were employees of defendant Georgia-Pacific Corporation at the plywood mill located at Crossett, Arkansas. Georgia-Pacific Corporation (hereafter G–P) was and is an employer engaged in interstate commerce within the definition of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, and employed some 3,000 persons for work in its facilities at Crossett. Both injunctive relief and backpay are sought. International Woodworkers of America, AFL–CIO, CLC, and its Local 5–475, are a Union and the local is the certified bargaining representative for G–P employees at the plywood, chemical and forestry operations at Crossett.

The Court, therefore, finds and concludes that it has jurisdiction of the parties and of the cause of action herein pursuant to 42 U.S.C. § 2000e–5(e), 28 U.S.C. § 1343 as to claims under 42 U.S.C. §§ 1981 and 1983, and 29 U.S.C. §§ 151 et seq. as to the involvement of the Union and its local.

The history of the forest products operations at Crossett, Arkansas, extends into the last century, G–P having purchased the Crossett facilities from The Crossett Company in 1962. It is an undisputed historical fact that the Crossett operations had been openly and intentionally segregated by custom, usage, and express and implicit prac-

tices and procedures. At the time the facilities were acquired by G–P the work force was segregated in that the paper mill was a "white" plant and the sawmill was a "black" plant. No major redistribution of the work force was undertaken by G–P. No training programs were established. No affirmative action programs were undertaken.

In 1965 the sawmill, which then had some 542 persons on its payroll, was closed and virtually all employees either laid off or retired. Only 16 employees at the "fuel house" were retained, being placed on the papermill payroll. Some 131 retired or were terminated. 10 sawmill employees, 6 white and 4 black, were employed at the papermill. 2 went to forestry, both white. 11 sawmill employees went to the flakeboard mill, 6 black and 5 white. Later in the year the then new plywood mill was opened and some 372 of the former sawmill employees were hired at this facility, 265 (71%) of whom were black.

The skilled maintenance positions at the plywood mill, millwrights, electricians, mechanics and welders, were higher paid than labor or machine operative positions. They were filled initially with whites, some of whom had little, if any, experience or qualifications. Some received special training. No black was afforded an opportunity to be employed in the plywood maintenance, and no black was offered an opportunity for special training to qualify for maintenance.

It is also apparent from the testimony and exhibits that black employees at the plywood mill were relegated to the most undesirable parts of the operation. The gluing section was more than 80% black, the green chain 90% black, and jitney drivers more than 90% black. Maintenance, truck drivers and log handling were 100% white, finishing and shipping 60% white, and supervision and clerical and management 100% white.

A similar pattern was followed in transfers or hires into plywood when the chemical plant was shut down in 1966. Black women were terminated, many of the black men were employed at plywood in lower, undesirable hourly wage classifications. Only 1 black was employed at paper, only 2 whites were employed at plywood, 16 whites went to paper, 41 blacks went to the plywood mill.

■ The Court, therefore, concludes that the plaintiffs have established by a preponderance of the evidence that there was, at the time of the commencement of initial operations at the G–P plywood mill, discrimination on the basis of race. This pattern and practice of racial discrimination extended to the assignment of blacks primarily to the plywood mill, rather than paper operations, the assignment of blacks to less desirable and more demanding jobs within plywood, the denial of any opportunity to blacks to be employed in management, supervision, or maintenance, and the effects of this pattern and practice have continued through the time of trial.

As of the date of trial, the paper mill remains almost 80% white, the plywood mill almost 80% black. Maintenance, management and supervision remain predominantly white. The less desirable "green end" and gluing departments remain almost all black.

One of the methods employed by G–P to perpetuate the plywood mill as a "black" plant and the paper mill as a "white" plant was the central personnel office through which those persons seeking employment with G–P at Crossett were processed. Until about the end of the 1976 calendar year, all persons who desired employment with G–P, except salaried employees in the chemical plant, made application at the central personnel office.

An application was taken and interviewers screened and referred applicants to the various plants. The interviewers were not provided with any objective standards for referral to a particular plant or a particular job. There were no job descriptions or objective evaluations of applicants. All of the persons responsible for evaluation and referral of applicants were white. All evaluations and referrals were based on virtually unguided, subjective evaluations of applicants. The central personnel office evalua-

tors were not familiar with the duties and requirements of the various types of employment at the various plants. Referrals to a particular plant or job were based primarily on the impression the applicant made on the interviewer.

The evidence shows that as of April 19, 1978, the paper mill remained almost 80% white and the plywood mill almost 80% black. Working conditions and the salary schedule at the paper mill are more desirable than at the plywood mill. It is not shown that there is any such disparity in the requirements of the jobs between the paper mill and the plywood mill as would rationalize the racial composition of the workforces at the two plants on the basis of superior educational attainments or superior mechanical training possessed by whites in the labor pool and not by blacks. G–P dropped a high school diploma requirement for entry into paper as not job-related. It is not suggested that those blacks who have transferred to paper as Designated Class Members (DCMs) under the agreement between G–P and the General Services Administration, which will be discussed hereinafter, were not capable of performing the requirements of employment in paper.

The Court finds that a prima facie case has been made by the statistical comparison between the paper and plywood mills that discrimination on the basis of race has resulted in the gross disparity in the racial composition of the workforces at the two plants. See *Griggs v. Duke Power*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *McDonnell-Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); and *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). G–P has completely failed to rebut the presumption of racial discrimination which is raised by such statistical disparity. The Court, therefore, concludes that G–P has been guilty of discrimination on the basis of race in employment and assignment of employees within the Crossett operations so as to perpetuate racial identifiability of the paper and plywood mills.

Although the central personnel office was discontinued prior to January 1, 1977, the decentralization of the hiring process to the various separate plant operations has not resulted in any improvement in the hiring statistics. New hires at the paper mill in 1977 and the first three months of 1978 were 80% white, new hires for the same period at the plywood mill were 72% black.

It is apparent that the past and present employment practices at G–P are not such as will alleviate the existing pattern of discrimination on the basis of race in hiring at either paper or plywood operations. Not only has the hiring of new applicants continued in the established pattern, but the severe discouragement of transfers between plants has set the existing effects of past discrimination in concrete.

A firm policy has long been established at G–P severely discouraging transfers between plants. The policy was such that transfers were impractical and unusual. A valid and nondiscriminatory basis for the policy was established, in that such transfers resulted in the loss of an employee trained in operations at one plant and the gain of an employee who would need to be trained at another, resulting in additional cost and inefficiency at both plants. In 1973 the policy was changed to a prohibition against transfers, except in unusual circumstances such as plant closings. The rule was, however, waived in connection with transfers of DCMs to paper from the plywood plant under the GSA agreement.

Although the rule is reasonable and justified by business necessity on its face, and although it is applied equally to blacks and whites, its impact is disproportionate against blacks. The effect of the rule is to freeze existing black employees who have been hired into less desirable jobs as a result of racial discrimination in the pattern of the past. The policy against inter-plant transfers will be disregarded in the shaping of such relief as may be necessary to alleviate the present effects of past discrimination on employees. The defendant has only its own shortsightedness in failing to recognize and correct an obvious pattern of dis-

crimination to blame for any extra cost or inconvenience which may result from any transfers necessary to accord complete relief.

The remedy to be fashioned in the second stage of this bifurcated litigation shall also include provisions for the establishment of job descriptions and work-related objective qualifications therefor and for future hiring practices such as to terminate any racial preferences in hiring and assignment in the entire G–P operations at Crossett.

The Court has carefully considered the dichotomy analyzed in *Kirby v. Colony Furniture Co., Inc.*, 613 F.2d 696 (8 Cir. 1980), between "disparate treatment" and "disparate impact". In view of the historical segregation which has resulted in the racial identifiability of the paper and plywood operations, it is apparent that the central hiring practices, assignment and hiring at the respective plants, and even the current hiring practices come within the "disparate impact" rule. As stated in Kirby, once disparate impact of a practice has been shown, the burden shifts to the employer to show that the practice has a "manifest relationship to the employment in question", the "touchstone is business necessity" and the practice "must be shown to be necessary to safe and efficient job performance to survive a Title VII challenge." 613 F.2d at pp. 702–703.

Under "disparate impact", it is not necessary to show that the employer has a motive or intent to discriminate, it is only necessary that the practice being considered impacts more heavily on the minority. The proof submitted on behalf of G–P is far short of demonstrating that these practices are a business necessity, necessary to safe and efficient operation of the plants. Certainly the former high school diploma and testing requirements for entry into the paper mill have been recognized as not job-related by G–P, both requirements having been voluntarily dropped.

It is clear that there was discrimination both before and after the enactment of Title VII. In *Teamsters v. U. S.*, 431 U.S. 324, 347, 97 S.Ct. 1843, 1860, 52 L.Ed.2d 396 (1977), the Court determined that pre-Act discrimination may not be remedied, even though its effects are currently perpetuated by a bona-fide seniority system. Post-Act discriminatees, however, may be awarded retroactive seniority and accelerated progression, where appropriate to make the remedy effective. Affirmative action programs to relieve the present effects of even pre-Act discrimination are not precluded, so long as they do not affect seniority.

Turning now from the relative racial composition of the paper and plywood plants to the plywood mill and its internal structure and operations, "disparate impact" is again apparent. The plywood mill, some 80% of the employees being black, is internally segregated on the basis of race. Management and most of the supervisors are white. Many of the lower paid and more demanding jobs are and have been virtually all black. Prior to the recent maintenance training program, desirable and high paying maintenance jobs were virtually all white. In general, whites were placed on the less demanding "dry end" jobs and blacks were relegated to the more demanding and less desirable "green end".

There were no blacks in plywood maintenance prior to 1972. The initial staffing of the maintenance department was all white, with some training provided to the initial staff, in that this was a new plant in 1965. There were, therefore, no maintenance employees with experience in the plywood plant and its machinery. No blacks were afforded an opportunity to obtain training, either outside or on the job, to qualify for maintenance.

Due to the virtual absence of qualified blacks from the labor pool, the percentage of black electricians, millwrights, or blacks with training or experience sufficient to qualify them for maintenance hire, it is understandable that there were no blacks hired initially into maintenance. This is not due to any discrimination on the part of G–P. Unavailability of qualified blacks within the labor pool is recognized as

a valid, non-discriminatory explanation for disparity in the ratio of blacks to whites hired for jobs requiring special skills, licenses or experience as a necessary qualification. *Hazelwood School District v. U. S.*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

■ One problem which should be alleviated is presented by the almost complete absence of job descriptions throughout the Crossett operations. There were no written descriptions of the duties and responsibilities of jobs, either those in the lines of progression within the bargaining unit or in maintenance or supervision. The lack of written standards and qualifications expected for such jobs leaves employees in the dark as to whether they might want to bid on a job, whether they possess the qualifications, and permits almost unrestricted subjective selection for promotion into maintenance and supervision.

Ostensibly, in order to qualify for plywood maintenance positions, for Millwright "A" two years of experience as a millwright in a plywood mill or related industry was one of the prerequisites, as well as an ability to cut and weld and work with metals. To qualify for Millwright "B", ability to cut and weld metal, knowledge of tools, and some millwright experience were needed. To qualify for promotion to one of the Maintenance Electrician positions, the applicant was expected to have an ability to read blueprints, knowledge of Ohm's Law and AC circuit power formulas and experience and training in electrical work. Similarly, Millwright Machinist applicants were expected to have a working knowledge of the equipment, ability to cut and weld, and two years experience in a millwright position in a plywood mill or related plant.

The evidence shows and the Court finds therefrom that the white persons selected for promotion directly into maintenance positions were not required to meet the ostensible criteria, but were permitted to become qualified and to accumulate the skills and experience necessary through on-the-job training. Black employees were not afforded the opportunity for promotion into maintenance, either in initial staffing or in replacements subsequent thereto. The Court finds that there were many black operatives who were as qualified, through their experience with the machinery to be maintained, but who were given no opportunity to become qualified as maintenance employees.

However, G–P initiated a maintenance training program in 1972 which has resulted in the training and advancement of a substantial number of blacks into maintenance positions. It is now the policy of the company to promote and train present employees for maintenance positions, when fully qualified and experienced persons cannot be hired from outside. The maintenance training program, as presently employed pursuant to the collective bargaining agreement, is bid for and entered solely on the basis of seniority of applicants.

■ The evidence shows that the persons entering the program from 1976 through 1977 were 4 blacks and 7 whites. Of these, one black and two whites were disqualified and sent back and one white went back to production, leaving 6 whites and only 3 blacks in the program. It is apparent that some modification in selection for the maintenance training program will be needed to the end that blacks are permitted to become qualified through this program in sufficient number to bring their employment in maintenance in line with their employment in the plant as a whole. Affirmative action will be directed toward either recruiting from outside or qualifying from the present employees sufficient black maintenance employees to be representative of their availability in the plant workforce.

■ What the Court perceives as the most glaring and obvious underrepresentation of blacks is present in supervisory positions. A. J. Harris is black. He entered plywood in 1965 and became a supervisor in 1970. He was made assistant plant superintendent in 1974. Leon Whaley is black and has been a supervisor since 1970. They are decidedly in the minority, since the plant has had percentages of blacks in supervisory positions ranging from some 14% to

9%. The Court finds that the evidence as to the availability of persons who are available in the labor pool in the vicinity of Crossett who are classified as supervisors is not pertinent, as there are within the plywood plant numerous blacks with sufficient experience and ability to qualify as supervisors who have not been given a true opportunity to be promoted. The policy of G–P is to promote supervisors from the hourly workforce, if available, as opposed to outside hire.

While Mr. Harris and Mr. Whaley testified that there were offers made to many capable and qualified blacks to join the ranks of supervisors, and G–P introduced some 14 written rejections of such tenders of promotion, blacks remain underrepresented in supervision in proportion to their availability within the hourly workforce. The apparent reluctance of the black employees to become supervisors is explained through both the economics involved and the history and system which remain barriers to the entry of blacks.

As was explained, many of the blacks with seniority are at the top of their lines of progression and, with overtime, are well paid. The move from hourly wages with overtime to supervisor trainee would involve a direct and considerable reduction in their income. Further, the agreement between the Union and G–P provides that after 30 days as probationary supervisors, supervisor trainees lose their membership in the bargaining unit and the benefits and protection which go with such membership. This provision has been construed to mean a total of 30 days, rather than 30 days consecutive service as a supervisor. This provision of the collective bargaining agreement has had a demonstrated disparate impact on entry of blacks into supervisory probation.

Blacks have, historically, been subjected to harassment while serving as supervisors, particularly when they have attempted to exercise direct supervision of white employees. Instances of such practice were given in evidence. Black supervisors have, historically, not been accorded the same privileges and responsibilities as whites. They have not had any prospects of promotion into management.

There are, for supervisory positions, again no descriptions of the duties and responsibilities of a job, no objective qualifications stated, and no guidelines for selection. Those who have been selected were picked on the basis of purely subjective evaluations by the overwhelmingly white force of existing supervisors. The Court finds and concludes that the plaintiffs have established by a preponderance of the evidence that they and members of the class whom they represent have been subjected to discrimination on the basis of race in the selection and promotion of supervisors. The Court further finds and holds that affirmative action is necessary to the alleviation of the continuing disparate impact of such racial discrimination.

Similar situations have been discovered, as in *U. S. v. N. L. Industries, Inc.*, 479 F.2d 354 (8 Cir. 1973); *Parson v. Kaiser Aluminum & Chemical Corp.*, 575 F.2d 1374 (5 Cir. 1978); and *Watkins v. Scott Paper Co.*, 530 F.2d 1159 (5 Cir. 1976). Each decision required a broad affirmative action remedy.

*Rogers v. International Paper Company*, 510 F.2d 1340 (8 Cir. 1975), is a case tried by this Court in another District, and virtually the entire opinion of the Court of Appeals for the Eighth Circuit, with the exception of the discussion of testing requirements, is applicable to the case at bar. The case was remanded by the Supreme Court, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29, for reconsideration in the light of *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), but this applied only to testing and did not otherwise detract from the opinion of the Eighth Circuit.

The central employment office referral practices, the passive nature of publicizing vacancies in management and supervision, the subjective selection process, and the failure to institute affirmative recruitment and promotion efforts after the passage of Title VII of the 1964 Civil Rights Act were held to justify a finding of discriminatory conduct. The freezing of blacks into plants and lines of progression into which they

were hired and placed, in less desirable and more demanding jobs, was held to be a continuing effect of past discrimination.

*Stewart v. General Motors Corp.*, 542 F.2d 445 (7 Cir. 1976), and *Kirby v. Colony Furniture Co., Inc.*, 613 F.2d 696 (8 Cir. 1980), are suggestive that the Stage II proceedings which will be necessary in view of the findings and conclusions herein must include provisions for the identification of those members of the class who have suffered the effects of the acts of discrimination found, and that these members must be afforded not only their "rightful place" but also back pay.

The individual plaintiff, Waymon Powell, is a long time employee of G–P, a transferee from the old sawmill to the plywood mill, who retired as a class "A" millwright May 26, 1978. He complained and filed a charge of discrimination on the basis of discrimination by separate lines of progression and separate training programs, as well as lack of promotion of blacks. He was offered an opportunity to transfer to the paper mill as a designated class member under the agreement between G–P and General Services Administration, and was paid $734.00 under that agreement. He declined the transfer.

Odell Lawson is also a long time employee who moved from the sawmill to the plywood mill. He complained about the separate lines of progression within plywood and the rules as to seniority within a line of progression. Under the GSA agreement he was paid $734.00 and was transferred to the paper mill on October 23, 1976.

Willie Ed Griffin did not testify, but he is also an employee, not a rejected applicant or qualified, according to the evidence, for clerical, sales or higher management.

Hershel W. Ward was employed at the plywood mill after being laid off at the flakeboard mill in 1966. He was a successful applicant for the maintenance department, after a Union grievance, in 1975. He transferred to the paper mill in 1977 under the GSA agreement and received $734.58. He complained of failure of promotion to maintenance and denial of transfer to the paper mill in connection therewith in 1971.

Claudell Smith entered the plywood mill from chemical when that plant was partially shut down in 1966. He was an applicant for plywood maintenance who was denied a maintenance position on the basis of lack of qualification and, after a maintenance trainee position was posted, on the basis of his seniority. He declined transfer to paper and was paid $652.00 under the GSA agreement. There is no indication whatever that any of these named plaintiffs were, in any way, capable of meeting the standards of typicality with the interests of a class of rejected applicants for employment or that they have any questions of law or fact in common with, or that they could fairly and adequately represent any persons who might constitute a class of rejected applicants for clerical, sales, or upper management positions. Under the standards of Rule 23, Federal Rules of Civil Procedure, as reaffirmed in *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), and *Tuft v. McDonnell Douglas Corp.*, 581 F.2d 1304 (8th Cir. 1978), these plaintiffs cannot represent such a class.

The Court, therefore, finds and concludes that the class represented by plaintiffs must be redefined from that which was conditionally certified. In view of the evidence which has been received, the Court finds that plaintiffs are representative of a class to be defined as:

Black employees of Georgia-Pacific Corporation at its facilities situated at Crossett, Arkansas, who have, because of their race, been assigned to less desirable operations and less desirable and more demanding jobs within operations; or, who have been denied, because of their race, transfers to more desirable or less demanding operations or jobs; or, who, as employees of the plywood mill at Crossett, Arkansas, have been, because of their race, denied opportunities for promotion to maintenance or supervisory jobs.

Of course, during Stage II proceedings, the members of the class must be identified, the individual relief to which they are entitled determined, and appropriate class relief considered and determined. Appropriate statutes of limitations and Title VII limitations will be considered at such time. The parties are directed to proceed forthwith, in the light of the foregoing findings and conclusions, with prompt preparation for a hearing in connection with Stage II of this litigation.

The GSA agreement is not to be considered in determining whether a member of the class in this litigation is entitled to relief, either in the nature or transfer, promotion, or by way of back pay, but any relief afforded to any member of the class under the GSA agreement shall be considered in the nature, degree or amount of relief to which such class member is entitled. If, for example, it is found that a member of the class herein is entitled to relief by way of transfer to paper, with enhanced seniority and accelerated progression, and to back pay, and if that member has already transferred to paper and received back pay under the GSA agreement, then he would receive only the benefits to which he was entitled in addition to those already received under the GSA agreement.

The Union, while a party plaintiff herein by its own choice of alignment, must be prepared to accept such modifications of its collective bargaining agreements as are found to be necessary and desirable to accomplish the relief to which the class members are found to be entitled. These may include modifications in seniority and the seniority system, as necessary to redress post-Title VII discrimination.

As settlements by mutual agreement are encouraged in Title VII proceedings, the parties are urged to engage in good faith discussion of possible stipulation and settlement of the Stage II proceedings, and are directed to report to the Court on the progress of preparation and settlement negotiations within 90 days after the date hereof.

## ON MOTION TO ALTER OR MODIFY OPINION

The Court has carefully considered the motion of the defendant filed November 4, 1980, seeking alteration or modification of the Memorandum Opinion of this Court in this cause filed October 23, 1980.

After such reconsideration, the Court is convinced that the class definition which appears at page 722 of that Opinion is overly broad, subject to misconstruction due to lack of precision, and that the class definition should be modified and the Memorandum Opinion amended and altered accordingly.

The Court recognizes that there are different labor unions representing different employee organizations in their collective bargaining with Georgia-Pacific at the Crossett facilities. There are additional cases in litigation in this Court involving claims for relief on behalf of other groups of employees and involving claims of discrimination by reason of race. None of the plaintiffs is or has been in such a posture as to be aware of the problems within operations other than the plywood facility. To open the Stage II proceedings to individual or class relief to other operations at Crossett would depart radically from the limitations of the conditional certification, the discovery accomplished, and the evidence received in the first stage hearing.

It is not and is not the intention of the Court to include in the Stage II proceedings in this litigation any individuals or class members who are not either present or former employees at the plywood mill operation at Crossett. It is readily seen that the class definition contained in the Memorandum Opinion is subject to such an interpretation, and could easily be read to include every black employee of G–P at the Crossett facilities, in whatever operation. This would result in a violation of the representational standards of Rule 23, F.R.C.P., and in affecting rights of persons and of labor unions not parties to or properly represented by parties to this litigation. There is a probability that this would also create a

virtually unmanageable class and would overly complicate the Stage II proceedings and unduly prolong these already protracted proceedings.

IT IS, THEREFORE, ORDERED that the Memorandum Opinion of this Court in this cause filed herein on October 23, 1980, be and the same is hereby modified and amended to substitute for the definition of the class represented by plaintiffs the following class definition:

Black hourly paid employees and former employees of Georgia-Pacific Corporation at its plywood mill operation at Crossett, Arkansas who have, because of their race, been initially assigned or transferred to the plywood mill operation, been assigned to more demanding and less desirable jobs within the operation, or been denied transfers to more desirable operations, more desirable and less demanding jobs within the plywood operation, or opportunities for promotion to maintenance or supervisory positions within the plywood mill operation. Applicable parameters as to the time such acts of discrimination will support individual claims or class relief will be determined in advance of the Stage II proceedings herein.

IT IS FURTHER ORDERED, in view of the modification of the class definition, that counsel for the parties and the class are directed to report to the Court on the progress of preparation for the Stage II proceedings and settlement negotiations in writing on or before February 20, 1981.

## ON TIME LIMITATIONS AND TYPE OF HEARING

In this bifurcated case, the Court entered an opinion on October 23, 1980, finding the defendant, Georgia-Pacific Corporation, liable for violations of the 1964 Civil Rights Act, 42 U.S.C. § 2000e and 42 U.S.C. § 1981. Prior to trial on the merits, the Court had conditionally certified the case as a class action. By Order entered December 18, 1980, the Court defined the class of black employees encompassed by the October opinion:

Black hourly paid employees and former employees of Georgia-Pacific Corporation at its plywood mill operation at Crossett, Arkansas who have, because of their race, been initially assigned or transferred to the plywood mill operation, been assigned to more demanding and less desirable jobs within the operation, or been denied transfers to more desirable operations, more desirable and less demanding jobs within the plywood operation, or opportunities for promotion to maintenance or supervisory positions within the plywood mill operation. Applicable parameters as to the time such acts of discrimination will support individual claims or class relief will be determined in advance of the Stage II proceedings herein.

The Court has encouraged the settlement of the case but to date, the parties have been unable to reach a settlement. At a regularly scheduled docket call, November 2, 1981, this case was reached. By Order entered on that date, the parties were requested to file simultaneous briefs on December 17, 1981, outlining their respective positions on the following issues:

1) The time limitations regarding class eligibility;

2) The time limitations regarding back pay liability; and

3) The type of hearing, in view of the Court's determination of liability, that is, whether Stage II will be tried individually or class-wide.

Responses to the briefs were to be filed by January 15, 1982. These have now been received and the Court proceeds to define the applicable parameters as to the time such acts of discrimination will support the claims for relief for Stage II proceedings.

The three issues now before the Court concern the trial of Stage II, the remedy phase of this action. It is hoped that the Court's ruling on these issues will expedite the resolution of the ancient case.

### 1. Time Limitations Regarding Class Eligibility

This action was filed January 12, 1973. The plaintiffs alleged the defendant violat-

ed Title VII and 42 U.S.C. § 1981 by discriminating against blacks on the basis of race.

The Court in its Memorandum Opinion did not differentiate between its findings of Title VII violations and § 1981 violations. The Court made specific findings with regard to disparate impact. Contrary to the statements of the defendant, however, the Opinion also contains specific findings of intentional discrimination or disparate treatment.[1] While the Court fully understands that proof of discriminatory motive is critical, it can in some situations be inferred from the mere fact of differences in treatment. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 1854, n. 15, 52 L.Ed.2d 396 (1977).

At the conclusion of the plaintiffs' case, the Court made a finding that they had met their burden of establishing a prima facie case of racial discrimination. *Williams v. Anderson*, 562 F.2d 1081, 1086–1088 (8th Cir. 1977). As stated in the Memorandum Opinion, the defendant, Georgia-Pacific Corporation, "completely failed" to rebut the inference of racial discrimination shown by statistical disparities. The disparate impact in assignments was the result of disparate treatment. *Furnco Construction Co. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). These findings support the § 1981 claims of the plaintiffs. Hence, the class eligibility may be determined under either standard, with the standard affording the greatest relief being utilized.

A Title VII class includes persons employed on or after a date six months before the filing of the earliest charge. *Hodgin v. Jefferson*, 447 F.Supp. 804 (D.Md. 1978). *See* C. Richey, *Manual on Employment Discrimination and Civil Rights Actions in the Federal Courts* (Federal Judicial Center, revised edition, 1981) § A–34. The earliest charge filed with the EEOC was that of Claudell Smith on May 2, 1971. Defendant's Exhibit 15. The Title VII class would then include all persons employed on or after November 3, 1970.

A § 1981 class includes persons employed during the § 1981 limitations period. In Arkansas, this period is three years. *Clark v. Mann*, 562 F.2d 1104 (8th Cir. 1977). The class would then include all black persons employed on or after a date three years before the filing of the lawsuit, that is January 12, 1970. *Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Martin v. Georgia-Pacific Corporation*, 568 F.2d 58 (8th Cir. 1977).

The Court finds that the class of black persons shall include all black persons employed by the defendant Georgia-Pacific Corporation on or after January 12, 1970 at its plywood mill operation at Crossett, Arkansas.

## 2. *The Time Limitations Regarding Back Pay Liability*

The limitations period for back pay in Title VII cases is contained in 42 U.S.C. § 2000e–5. It states:

Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission.

In this case, the Court cannot order a back pay award to commence prior to May 2, 1969, this being two years prior to the filing of the first EEOC charge. The defendant argues that this statute gives the outer parameter of the time limitation but does not compel the Court to allow the accrual of back pay for the two years prior to the first charge. The Court need not reach this issue as it concludes that the back pay award should begin to accrue on May 2, 1969. The evidence presented at trial revealed the defendant has a history of discriminatory practices, customs, and usages. The Court is of the opinion that use of the outer parameter is justified in this case and fully in keeping with the remedial purposes of Title VII. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417–418, 95 S.Ct. 2362, 2371–72, 45 L.Ed.2d 280 (1975); *Stewart v. General Motors Corp.*, 542 F.2d 445 (7th Cir. 1976). Hence, the defendant is liable for

---

1. See pages 10–11, 13 of the Court's Memorandum Opinion.

back pay for the eligible class members from May 2, 1969 until October 23, 1980.

3. *The type of hearing for determination of liability, that is, whether Stage II will be tried individually or classwide*

 This issue presents a very difficult problem for the Court as well as the parties should an actual trial on Stage II issues be necessary. The Court is of the opinion that subclasses are appropriate in this action. There are four identifiable groups delineated in the class definition.

1) black plywood employees not initially assigned to paper;

2) black plywood employees denied transfer to paper;

3) black plywood employees denied promotion to supervisor in plywood; and

4) black plywood employees denied transfer to plywood maintenance.

In *Kirby v. Colony Furniture Co., Inc.*, 613 F.2d 696 (8th Cir. 1980), the Court of Appeals approved the guidelines for the computation of classwide back pay relief enunciated in *Stewart v. General Motors Corp., supra.* In *Stewart*, the Court of Appeals for the Seventh Circuit stated:

... Where possible, an individualized remedy should be utilized because it will best compensate the victims of discrimination without unfairly penalizing the employer ... In determining the appropriate award to be made to black employees who were unfairly denied promotions to salaried positions, however, the utilization of an individualized method of calculations is impossible. *Because General Motors had no objective standards by which to measure whether a given employee deserved a promotion, deciding in individual cases whether a particular person would have been promoted but for racial discrimination would lead the district court into a "quagmire of hypothetical judgments,"* see *Pettway* [*v. American Cast Iron Pipe Co.*], 494 F.2d [211] at 260, *in which any supposed accuracy in result would be purely imaginary. Stewart* at page 452.

The Court is of the opinion that a classwide approach is necessary and appropriate for Subgroup One, those black employees not initially assigned to paper. The Memorandum Opinion stated that applicants selected for hire were assigned to one or the other facility on the basis of race. There was no evidence that jobs in the paper mill required more education or training than jobs in the plywood plant. Therefore, all applicants who were in fact hired must be presumed, for back pay purposes, to be equally qualified for positions in the paper mill. A formula for back pay liability should be determined utilizing the detailed outline and guide provided by the Eighth Circuit Court of Appeals in *Hameed v. International Association of Bridge, Structural and Ornamental Iron Workers, Local Union 396, et al.*, 637 F.2d 506 (8th Cir. 1980).

Subgroup Two is subsumed by Subgroup One. The defendant, as found in the Memorandum Opinion, had a firm no-transfer policy. Once an employee was assigned to plywood he had no chance of being transferred to a more desirable job in paper. Again, a classwide approach will be utilized with Subgroup Two. Because of the no-transfer policy, it would be futile to require victims of the practice to show individually that they made a futile gesture of applying for a transfer. This is simply not the applicable standard under the law and would merely serve to relitigate the issue. *Dothard v. Rawlinson*, 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977).

Subgroup Three will also require the use of a classwide approach. The Court has found that blacks were denied promotions to supervisory positions. The company had a policy of promoting from within to these positions. Blacks were seriously underrepresented. There is no basis for finding that blacks should not have received the same percentage of the promotions to supervisory jobs as was their percentage of the plant workforce. There is no basis in the record for finding that any member of the class employed at the time of a given opening would not have been a possible selection for it. Therefore, an aggregate damage figure should be calculated based on the number

of vacancies that would have been filled by blacks if blacks had received a proportionate share of the positions and the difference between supervisory and non-supervisory, non-maintenance wages. The damages should be spread among members of the class in accordance with their dates of employment unless the employer can show that some employees should be disqualified either based on personal or general characteristics. Again, the guidelines set out in *Stewart* and *Hameed* will be utilized.

Subgroup Four covers those blacks who were denied promotions to maintenance jobs. Again, the Court in its Memorandum Opinion stated that the company promoted from within for maintenance jobs but excluded blacks. Further, the company had no established educational or experience prerequisites to assignment to maintenance. Unqualified whites were frequently promoted and received on-the-job training. Hence, the opinion and facts presented at Stage I provide no basis for a finding that blacks should not have received a share of maintenance jobs commensurate with their representation in the plywood plant workforce. Again, the classwide guidelines presented in *Stewart* and *Hameed* will be utilized at Stage II.

Because there were no objective standards utilized by the company, an individualized approach would require the Court to speculate as to which class members would have been promoted, transferred, etc. This would not be equitable.

> ... Given a choice between no compensation for black employees who have been illegally denied promotions and an approximate measure of damages, we choose the latter. *Stewart,* supra at 453.

Due to the complexity and impending trial on the question of relief, the Court has decided to issue this Memorandum Opinion, as previously noted in definition of class, to serve as guidelines for preparation of trial of Stage II of the action.

IT IS, THEREFORE, CONSIDERED AND ORDERED that the parties to the action proceed on the basis of the entire record and the decisions of the Court entered herein toward trial of Stage II, a resolution of appropriate and equitable relief in this case.

IT IS FURTHER ORDERED that the parties file a report with the Court as required in Rule 21 of the Local Rules together with their statistical approach to the classwide determination of relief within ninety (90) days.

IT IS FURTHER ORDERED that should there be any necessity for further discovery in accordance with the guidelines contained in the Court's Memorandum Opinion herein that said discovery shall be completed no later than September 1, 1982.