**Waymon POWELL, et al., Plaintiffs,**

v.

**GEORGIA–PACIFIC CORPORATION, Defendant.**

**Civ. Nos. ED–73–C–1, ED–73–C–3.**

United States District Court,
W.D. Arkansas,
El Dorado Division.

Jan. 31, 1994.

Thomas H. McGowan, Youngdahl, Sadin & McGowan, Little Rock, AR, Ronald L. Ellis, NAACP Legal Defense and Educ. Fund, New York City, John W. Walker, Little Rock, AR, for plaintiffs.

Kathlyn Graves, Wright, Lindsey & Jennings, Little Rock, AR, for defendant.

### *MEMORANDUM OPINION*

H. FRANKLIN WATERS, Chief Judge.

This class action race discrimination case began more than twenty years ago. The court is now asked to determine the appro-

priate method of distribution of residual settlement funds in an amount exceeding $900,000.00.

### Historical Background.

These actions were originally filed in 1973. Case ED–73–C–1 was filed by five individuals alleging that they represented a class of African–American employees and applicants for employment at the facilities of Georgia–Pacific Corporation at Crossett, Arkansas, who had suffered racial discrimination in employment and employment decisions. Case ED–73–C–3 was filed by the International Woodworkers of America making similar allegations on behalf of certain African–American employees at the same facilities. The plaintiffs asserted causes of action under Title VII, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. The two actions were consolidated in 1974.

Georgia Pacific acquired the paper and plywood facilities at issue in 1962. *Memorandum Opinion of October 23, 1980,* 535 F.Supp. 713, 716. By memorandum opinion entered on October 23, 1980, the court found Georgia–Pacific liable for violations of Title VII. *Memorandum Op.* at 717. The court specifically found that the

> pattern and practice of racial discrimination extended to the assignment of blacks primarily to the plywood mill, rather than paper operations, the assignment of blacks to less desirable and more demanding jobs within plywood, the denial of any opportunity to blacks to be employed in management, supervision, or maintenance, and the effects of this pattern and practice have continued through the time of trial.

*Memorandum Op.* at 717. The class was redefined as:

> Black employees of Georgia–Pacific Corporation at its facilities situated at Crossett, Arkansas, who have, because of their race, been assigned to less desirable operations and less desirable and more demanding jobs within operations; or, who have been denied, because of their race, transfers to more desirable or less demanding operations or jobs; or who, as employees of the plywood mill at Crossett, Arkansas, have

been, because of their race, denied opportunities for promotion to maintenance or supervisory jobs.

*Memorandum Op.* at 722.

The matter was then to proceed to stage two proceedings to determine damages and fashion a remedy. The parties thereafter entered into a settlement of the remedy aspects of the lawsuit with the exact terms of the consent decree to be worked out at a later time.[1] Pursuant to this settlement agreement Georgia–Pacific paid into the registry of the court on February 1, 1983, the sum of $2,666,667.00 "in full and final settlement of the money claims of the plaintiffs and members of the class resulting from alleged race discrimination...." *Decree,* para. 7, at p. 5. The order directing the deposit of these funds stated that the sum "together with any interest earned after such deposit shall constitute a Settlement Fund for distribution to the named plaintiffs and the class members in a manner to be approved or directed by the Court."

The $2,666,667.00 including earned interest was referred to as the settlement fund. *Decree,* para. 7, at p. 5. The decree provided for the setting aside of $350,000.00 of the settlement fund to constitute a contingency fund for "inadvertently excluded class members, underpayments, computational errors, and other items properly chargeable to the Settlement Fund and for the purposes for which it was established." *Id.* at para. 8(a), p. 5. Counsel for plaintiffs were designated as trustees of the fund and given the authority to make disbursements from the fund provided prior court approval was obtained for any disbursements in excess of $500.00. *Id.* A sum of money, $124,750.00, was also set aside for payment to "special circumstances" individuals.

The decree provided for a point system to be utilized in determining back-pay amounts to be paid to individual class members. Class members were not required to file individual claims and Georgia–Pacific was charged with identifying those individuals who were eligible to receive money. *Decree,* para. 9(a), at p. 7. Each individual identified

---

1. The parties did not agree on the terms of the consent decree until March 4, 1984.

was to receive a check in the amount of points assigned to him or her multiplied by the dollar figure per point arrived at in accordance with the decree less standard payroll deductions. Each check was mailed to the last known address of the individual and carried "a legend or endorsement to the effect that it is 'in full and final settlement of claims against Georgia–Pacific....' " *Decree,* para. 9(f), at p. 8. In connection with surplus funds the decree provided "any monies still in the registry of the Court either as a surplus in the Settlement Fund or a surplus in the Contingency Fund, disposition shall be as approved by the Court with Georgia–Pacific having no liability or responsibility therefor." *Id.* at para. 9(h), p. 8. The consent decree was given final approval by the court on June 11, 1984.

The injunctive aspects of the decree were to remain in effect for a period of three years. If no actions to enforce compliance were filed within the three year period, the decree provided for the dissolution of the injunction and the dismissal of the action with prejudice.

By March of 1984 the settlement funds had grown to $2,936,140.56. *Stipulation filed July 14, 1993,* at para. 3. The figure utilized by Georgia–Pacific in applying the point system was $2,461,400.00. *Stipulation* at para. 4. This figure was proposed in March of 1984. Although the bulk of the settlement funds were not distributed pursuant to the terms of the consent decree until December of 1984, no adjustment of the figure utilized in applying the point system was made. *Stipulation* at para. 8. The court order approved disbursement of $2,555,320.57. *Stipulation* at para. 11. Various other small disbursements were made and in September of 1985 Georgia–Pacific asked that it be dismissed from any further responsibility for the monetary fund. The order entered on September 12, 1985, provided that Georgia–Pacific "be released of and discharged from any further obligations, liabilities or responsibilities under the Consent Decree" other than the injunctive aspects of the decree. The order dismissed with prejudice all aspects of the case with the exception of the paragraphs of the consent decree setting forth injunctive relief.

On June 15, 1987, a dismissal order was entered which dissolved the consent decree and the injunction contained therein. The order stated "[t]hat this Court retain jurisdiction with respect to monies still in the registry of this Court subject to further orders of the Court, defendant Georgia–Pacific Corporation having no rights or interest in such monies." No disbursements from the funds in the registry of the court have been made or requested since 1987.

### Motion for Distribution.

On October 8, 1992, more than five years after the last distribution from the funds in the registry of the court, plaintiffs filed a motion for distribution of the remaining funds. The matter was referred by order entered on October 19, 1992, to a Special Master pursuant to Rule 53(a) of the Federal Rules of Civil Procedure to determine the proper disposition of the registry funds. The master's report and recommendation was filed on December 3, 1993. On December 17, 1993, the defendant filed objections to the report and recommendations. The court has reviewed the report and recommendations, the briefs of the parties, the objections, and has listened to the tape of the hearing before the master.

Plaintiffs initially asked the court to allow the named plaintiffs to cause to be created a tax exempt, non-profit scholarship fund to be the recipient of the funds and to direct their distribution for scholarship and educational purposes. The court was informed that at the time of the settlement it was the intent of plaintiffs to cause the creation of a scholarship fund for plaintiffs and their children and close relatives so as to promote the enhancement of educational opportunity for that group of beneficiaries.

On January 19, 1993, the International Woodworkers of American and its Local 5–475 (hereinafter Union) filed a status report indicating its belief that no equitable means could be determined to ensure that the scholarships would primarily benefit the relatives of class members. The Union further indicated that administrative and tax considerations diminished the appeal of the scholar-

ship program. The Union then asked that the remaining funds be distributed to class members using the point system enumerated in the consent decree. The Union opined that a general scholarship program would not be satisfactory to the Union or class members and it would not serve any purpose contemplated by the parties in the settlement.

All parties agree that there were discussions among the lawyers for the parties regarding the use of excess funds for scholarship purposes at the time the consent decree was negotiated and entered. However, no consensus on this point was ever reached. Georgia–Pacific states it was never contemplated that the surplus funds be disbursed to the plaintiff class members.

In its status report filed on January 19, 1993, Georgia–Pacific proposed that the funds in the registry of the court be transferred to the Georgia–Pacific Foundation, a non-profit corporation. The foundation would invest and administer the funds for the purpose of funding scholarships. Georgia–Pacific believed that the most effective use of the funds would be to provide educational opportunities for African–Americans to allow them to obtain the necessary educational backgrounds to fill supervisory, managerial, and technical positions in Georgia–Pacific's work force. Georgia–Pacific contends this would be the best use of the funds because the underlying claims in the original class action were that African–Americans were not promoted to supervisory positions and that African–Americans were under-represented in Georgia–Pacific's paper mill and over-represented in the plywood mill.

Georgia–Pacific proposed that specific colleges and universities in the Southeast be identified which grant degrees in technical studies related to the paper and wood pulp industries. The identified schools would be limited to selecting African–American students participating in those programs. The schools would select the recipients. The rationale for limiting the geographical area of the schools to the Southeast was that this is an important geographical area from which Georgia–Pacific draws its employees. Georgia–Pacific stated it would also like to explore the possibility of some type of grant for math and science programs in elementary and secondary schools in order to increase the pool of African–American students who would be academically prepared to pursue these scholarships.

A hearing was held before the master on March 11, 1993, at which Georgia–Pacific presented the bare outlines of its proposed scholarship program. A list of selected colleges and the proposed selection criteria was introduced. The parties also discussed the various other options the court had in disbursing the money.

Georgia–Pacific advised the court that it had a previous Internal Revenue Service ruling that would allow it to disburse the funds without tax consequences to the Foundation or the scholarship recipients. The registry funds would be paid into a segregated endowment fund and would at all times be kept separate from other funds being administered by the Foundation. Additionally, the Master was informed that the Foundation is audited annually and could lose its tax exempt status if all scholarship money was not spent for scholarships. The Foundation would not make any charge for administration of the fund. However, a small amount would be charged against the fund, approximately $300.00 per year, representing a small percentage of the portfolio manager's fee and other expenses.

Rebecca M. Crockford, the president and treasurer of the Georgia–Pacific Foundation, outlined the following aspects of the scholarship program: (1) four year scholarships would be awarded annually to African–American seniors; (2) the scholarship program would be advertised to selected high schools; (3) selection of the scholarship winners would be made by the designated colleges according to specified criteria; (4) the criteria to be used would include scholastic achievement, character, and need; and (5) the recipient would be required to remain enrolled in college throughout the scholarship period, would need to maintain an annual grade point average of 2.5 on a 4.0 scale, and would lose the scholarship if the recipient changed his or her course of study or dropped out of the work study program.

The Foundation selected the colleges on its list by looking at a twenty-year history of the colleges attended by Crossett recipients of scholarships, by looking at colleges attended by current workers at the Georgia–Pacific Crossett plant, and by looking at the types of degrees desirable in Georgia–Pacific's paper mill. The selected colleges were also required to have a cooperative education program in which the student would work one quarter at Georgia–Pacific.

At the hearing, plaintiffs again took the position that the funds should be disbursed to class members. Plaintiffs stated they would have preferred the creation of a scholarship fund but that they could not agree with the Georgia–Pacific Foundation having control of the fund and were prevented because of adverse tax consequences from limiting the recipients of scholarships to children or grandchildren of the employees of Georgia–Pacific.

Plaintiffs additionally objected to the proposed scholarship program on the following grounds: (1) the scholarship program as outlined did not meet the needs of the African–American population; (2) the scholarship program as outlined amounted to a public relations program for Georgia–Pacific; (3) the program as outlined was restricted to a few technical degrees and a few selected colleges; (4) Georgia–Pacific Foundation did not consult with class members or the union representatives; (5) the list of schools did not include any local colleges or historically African–American universities; (6) no consideration was given to socio-economic statistics for the Crossett area; (7) the program was not restricted to benefitting African–Americans living in Southeast Arkansas around the Crossett area; and (8) the program should be designed to help more individuals. Georgia–Pacific did not have the benefit of the plaintiffs' input as plaintiffs took the position they were entitled to the distribution of the funds. Once plaintiffs took this position, they apparently declined to participate in any negotiations regarding the scholarship program.

In view of plaintiffs' request for distribution to class members and their disagreement with the creation of a scholarship program, the defendant took the position that it equitably had a claim to the remaining funds. The defendant now asks that the funds be returned to it or in the alternative that the funds be distributed under the cy pres doctrine to a scholarship fund administered by the Georgia–Pacific Foundation. Defendant points out that there is no language in the consent decree even suggesting that any unclaimed balance be distributed to identified class members. By the same token, the court notes there is no language in the consent decree suggesting that any unclaimed funds should be returned to Georgia–Pacific.

### Law on Distribution of unclaimed funds.

The court has retained jurisdiction for the purpose of issuing orders regarding the distribution of the unclaimed funds in the registry of the court. It is generally agreed that neither the class members nor the settling defendant have any legal right to unclaimed or excess funds. *See e.g., Wilson v. Southwest Airlines, Inc.,* 880 F.2d 807, 811 (5th Cir.1989); *In re Folding Carton Antitrust Litigation,* 744 F.2d 1252, 1254 (7th Cir.1984), *cert. dismissed,* 471 U.S. 1113, 106 S.Ct. 11, 86 L.Ed.2d 269 (1985). Until the settlement funds are completely distributed, the court retains its traditional equitable powers. *See e.g., Beecher v. Able,* 575 F.2d 1010, 1016 (2d Cir.1978); *In re Agent Orange Product Liability Litigation,* 611 F.Supp. 1396, 1402 (E.D.N.Y.1985).

A variety of methods have been utilized by the courts in distributing remaining class damages or class settlement funds. These methods include: (1) claimant fund-sharing; (2) reversion to the defendant; (3) general or specified escheat to a governmental body; and (4) cy pres distribution. *See generally,* 2 Herbert B Newberg & Alba Conte, Newberg on Class Actions §§ 10.13 to 10.25 (3d Ed.1992). The district court's order of distribution is subject to review for abuse of discretion. *In re Equity Funding Corp. of America Securities Litigation,* 603 F.2d 1353, 1362–65 (9th Cir.1979).

In determining which method to utilize the courts have looked to the basic purpose of the statute or statutes under which the class action was brought. *Six Mexican Workers*

*v. Arizona Citrus Growers,* 904 F.2d 1301, 1307 (9th Cir.1990). Title VII itself is designed primarily to make whole victims of unlawful employment discrimination. *Wilson v. Southwest Airlines, Inc.,* 880 F.2d 807, 812 (5th Cir.1989). However, Title VII also represents a policy that Congress considered to be of the highest priority and as such has a definite deterrent effect. *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).

The first method, claimant fund-sharing, involves the distribution of the remaining funds to the class members who received earlier distributions. *Boeing Co. v. Van Gemert,* 444 U.S. 472, 481–82 & n. 7, 100 S.Ct. 745, 750–51 & n. 7, 62 L.Ed.2d 676 (1980) ("The members of the class, whether or not they assert their rights, are at least the equitable owners of their respective shares in the recovery."). This method provides no benefit to nonclaiming or unidentified class members, who would appear to have superior equitable interests in the remaining fund. *In re Folding Carton Antitrust Litigation,* 557 F.Supp. 1091, 1107 (N.D.Ill.1983), *aff'd in pertinent part,* 744 F.2d 1252, 1254, 1257 (7th Cir.1984), *cert. dismissed,* 471 U.S. 1113, 106 S.Ct. 11, 86 L.Ed.2d 269 (1985). This is the method of distribution recommended by the Master.

The second method, reversion to the defendant, involves the reversion of any funds remaining after individual distribution to the defendant. The Supreme Court has recognized that the defendant may have an interest in a reversion of unclaimed settlement funds. *Boeing Co. v. Van Gemert,* 444 U.S. 472, 481 n. 7, 482, 100 S.Ct. 745, 751 n. 7, 751 (1980).

As the defendant points out, this method has been utilized in the context of a class action under Title VII. *See, Wilson v. Southwest Airlines, Inc.,* 880 F.2d 807, 812 (5th Cir.1989). In *Wilson* the court noted that the basic purpose of the fund was to make whole, in accordance with Title VII's compensatory objectives, the members of the class. Once this had been accomplished, the court found that the defendant had an equitable claim to the money because it had been turned over for the specific and limited purpose of compensating the class.

This was true despite the existence of a non-refundability provision in the consent decree. Relying on a transcript of the fairness hearing the court found the non-refundability clause to be provisional. *Id.* at 814. The court noted:

> the record reflects that class counsel, Southwest and the district judge all understood the limited purpose and narrow scope of the nonrefundability clause in the consent decree, and realized that despite Southwest's relinquishment of its legal claim by virtue of the clause, once that purpose was achieved and all obligations to the class were fairly discharged, the clause would not bar a return of any excess to Southwest in recognition of its equitable claim.

*Id.*

One noted authority on the subject of class actions has stated that:

> it is probably the prevailing view that defendants who have paid their judgments into escrow have no claim to the return of any unclaimed monies which belong to parties not before the court, and in the absence of alternative arrangements those monies will properly escheat or otherwise be distributed in the sound discretion of the court if they remain unclaimed.

*Newberg,* § 10.24 at 10–65. In this same vein, Newberg states:

> Because the defendant has already conceded its potential out-of-pocket exposure for the entire potential recovery fund as party of the settlement, the substantive policies underlying the statutes upon which the plaintiffs sued would dictate a preference for an appropriate cy pres distribution rather than a reversion of undistributed funds to the defendant, the alleged wrongdoer, despite any disclaimer of liability in the settlement.

*Newberg,* § 11.20 at 11–29.

The third method, escheat to the government, would require the turn-over of the funds to the United States Treasury pursuant to 28 U.S.C. §§ 2041, 2042 or the application or state escheat law. Section 2041 pro-

vides that "[a]ll moneys paid into any court of the United States, or received by the officers thereof, in any case pending or adjudicated in such court, shall be forthwith deposited with the Treasurer of the United States or a designated depositary, in the name and to the credit of such court." Section 2042 provides:

> In every case in which the right to withdraw money deposited in court under section 2041 has been adjudicated or is not in dispute and such money has remained so deposited for at least five years unclaimed by the person entitled thereto, such court shall cause such money to be deposited in the Treasury in the name and to the credit of the United States. Any claimant entitled to any such money may, on petition to the court and upon notice to the United States attorney and full proof of the right thereto, obtain an order directing payment to him.

As § 2042 permits an entitled claimant to recover from the United States, the escheat is "impermanent and also raises no unconstitutional taking." *In re Folding Carton Antitrust Litigation*, 744 F.2d 1252, 1255 (7th Cir.1984) (ordering escheat of unclaimed funds in antitrust litigation).

Although the term escheat is used, the United States obtains no beneficial interest in the funds but merely holds the money as trustee for the rightful owners. *See In re Folding Carton Antitrust Litigation*, 744 F.2d 1252, 1257 (7th Cir.1984) (Flaum, J., concurring in part and dissenting in part). *See also United States v. Klein*, 303 U.S. 276, 279–80, 58 S.Ct. 536, 82 L.Ed. 840 (1938); *United States v. Seventeen Thousand, Four Hundred Dollars in Currency*, 524 F.2d 1105, 1109 (Doyle, J., dissenting) (deposit under 2042 does not act as an escheat). Application of state escheat laws to unclaimed funds created under federal law has been recognized as a viable alternative. *See e.g., Hodgson v. Wheaton Glass Co.*, 446 F.2d 527, 535 (3d Cir.1971).

The fourth method, cy pres distribution, requires the distribution of the funds for the indirect benefit of the class. This method has been somewhat controversial and is most often used in the cases involving settlements of class actions rather than adjudicated class actions. *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir.1990) (consideration of cy pres distribution appropriate in case involving unclaimed funds); *In re Agent Orange Product Liability Litigation*, 597 F.Supp. 740, 841 (E.D.N.Y. 1984). The cy pres doctrine has been described in the following terms:

> This disposition of funds that have not been individually distributed, by distributing them for the next best use which is for indirect class benefit, has been approved under the equitable power of courts in various cases under the analogous cy pres doctrine. The cy pres, or next best use, doctrine originated in the charitable trust field when courts took steps to prevent the failure of trusts. In the class action context, cy pres applications have also been referred to as fluid class recovery distributions.

*Newberg*, at § 11.20, p. 11–26.

At least one court after having examined the case law in this area, has concluded the doctrine is no longer regarded as being limited and restricted to the closest comparable alternative to the original purpose and is regarded as being more flexible. *See Superior Bev. Co. v. Owens–Illinois*, 827 F.Supp. 477, 479 (N.D.Ill.1993). In *Superior Beverage* the court noted that:

> while use of funds for purposes closely related to their origin is still the best cy pres application, the doctrine of cy pres and courts' broad equitable powers now permit use of funds for other public interest purposes by educational, charitable, and other public service organizations, both for current programs or, where appropriate, to constitute an endowment and source of future income for long-range programs to be used in conjunction with other funds raised contemporaneously.

*Id.* at 479.

***Discussion.***

█ The master recommends that the funds be distributed to the class members

pro rata.[2] The master's conclusion is based on the view that the individual class members in this case were not fully compensated because the method of payment, the formula set forth in the consent decree, in no way represented the exact amount of money a member of the class might have lost. Because this case involved both hiring and promotional claims the master noted it would have been impossible to have come up with a rigid standard for determining the exact amount of economic loss to an individual class member and thus provide that class member full compensation.

Additionally, the report indicates that all but approximately $100,000.00 of the remaining funds is attributable to interest and therefore by definition belongs to the class members. As previously noted, the consent decree defined the settlement fund to include earned interest.

The master found that the equitable principles of estoppel and waiver required a finding that defendant had no standing now to either claim the funds or to assert how it should be allocated. This finding was based on the fact that Georgia–Pacific obtained a final dismissal order and waited almost five and one-half years to assert a claim to the funds. Finally, the master agreed with the plaintiffs that the cy pres doctrine should not be utilized because the funds could be used to compensate the class members directly.

The defendant objects to the report and recommendations of the master on a number of different grounds. We will not set forth all objections but have given careful consideration to all points raised by the defendant.

The defendant strenuously objects to the Master's conclusion that all but approximately $100,000 of the funds is attributable to earned interest. According to defendant's calculations the December, 1984, distribution included interest earned through March of 1984. Defendant also argues that plaintiffs

waived any right to claim interest earned from March to December of 1984 because they failed to request alteration of the figure used in the point allocation process.

In connection with the master's finding that the equitable principles of waiver and estoppel deprive the defendant of standing, Georgia–Pacific argues that the conclusion is erroneous. If the principles are applicable, Georgia–Pacific contends that these principles apply equally to the plaintiffs. Georgia–Pacific points out that the cases were dismissed as to the identified plaintiffs in 1985 and that the plaintiffs were on the same notice as Georgia–Pacific regarding the amount of the fund in the registry of the court at that time. It is further pointed out that neither party negotiated a provision in the consent decree providing for the disbursement or reversion of funds to that party.

Defendant next asserts that the master erred in not distinguishing between the identified class members and the unidentified class members. The contingency fund was set aside to compensate inadvertently excluded class members and to correct underpayments or computational errors. Defendant contends it is this contingency fund that has continued to accumulate interest over the years. Clearly, the consent decree makes no provision for the distribution of the contingency fund and interest accrued on it.

Defendant's final point is of practical significance. Georgia–Pacific points out that the master failed to take into consideration how a distribution to class members would be carried out. As Georgia–Pacific points out, the original distribution occurred almost ten years ago. Even at the time of original distribution we are informed that 125 checks were returned as undeliverable.

A method would have to be devised for the distribution of the funds including the locat-

2. In plaintiffs' January 19, 1993, status report they asked that the funds be distributed to class members using the point system enumerated in the consent decree. Later requests ask that the funds be distributed pursuant to paragraph 8 of the consent decree. Paragraph 8 of the decree is the portion of the decree dealing with the creation of the contingency fund, the appointment

of plaintiffs' counsel as trustees, and the authority for disbursements without the consent of the court four amounts under $500. The point system is found in paragraph 9 of the consent decree. It is unclear to the court whether plaintiffs' request for distribution is a request for distribution under the point system or for distribution in some other manner.

ing of almost 2000 class members, the computation of the amount each member was entitled to under the consent decree formula, the computation and withholding of payroll taxes, and the actual issuing and mailing of the checks.[3] Further, provision would have to be made for the handling of checks returned as undeliverable and the distribution of the funds resulting from the undeliverable checks.

The original process of identifying class members and their addresses and of allocating points was time consuming. The first distribution took from March 28, 1984, until December 10, 1984, to complete. Pursuant to the terms of the decree the costs of distribution were borne by Georgia–Pacific. Clearly, Georgia–Pacific has no further obligation in this regard. Further distribution to the class members would, without a doubt, be a complex matter further complicated by the number of years that have passed since the original distribution. No estimate was given to the court regarding the cost of such distribution; nor was any proposal presented for the method of distribution.

After a great deal of consideration, we reject the recommendation of the master. We believe a reversion to the defendant or a distribution to identified class members is not appropriate in this case. No provision was made for the disposition of remaining funds to either the class members or the defendant. The funds were not utilized for contingencies and plaintiffs' counsel now contends there are no outstanding contingencies. The clear terms of the consent decree and other orders entered in this case lead the court to conclude that a distribution to either the class or the defendant was not contemplated and in the court's view would not be an equitable distribution of the remaining funds.

Both the class members and the defendant received the benefit of the consent decree in this case. The parties settled this case for a specified sum. Georgia–Pacific fulfilled its obligations under the consent decree and in turn was relieved of any further liability to the class members and of any liability or responsibility for the remaining funds.

Likewise, the class members through their representatives and counsel agreed to a point system method of distribution relieving each member of the requirement of making an individual claim. The point system was derived because of the inherent difficulty in determining the amount of loss or compensation due each individual class member. Each identified class member received and accepted as payment in full the sum the member was entitled to under the point system. Thus, each identified member was fully compensated under the terms of the consent decree.

It is not uncommon in a class action settlement to have undisbursed funds in the registry of the court. In such circumstances the courts are called on to equitably determine the best means of distributing those funds. The class action device itself has its origin in equity. *Montgomery Ward & Co. v. Langer*, 168 F.2d 182, 187 (8th Cir.1948). Under the particular circumstances of this case, the court believes either escheat to the government or distribution under the cy pres doctrine would be a more appropriate and equitable distribution of the funds.

Clearly all parties to this lawsuit at one time contemplated the creation of a scholarship fund. In fact, the plaintiffs' motion for disbursement of the funds asked that they be allowed to create a tax exempt foundation to administer a scholarship fund. It was only when plaintiffs determined they could not, without significant tax consequences, specifically limit the scholarship beneficiaries to close relatives of class members that the plaintiffs changed their request to one of distribution to the class.

In the court's view the funds in the registry remaining after payment of the compensation of the master should be disbursed to the Georgia–Pacific Foundation. The Foundation is already in existence as a tax-exempt organization and has informed the court that any disbursement to it or to scholarship recipients would be free of tax consequences. The Foundation additionally has an already

---

**3.** *See* footnote 2, *supra.*

existing mechanism for administering the funds as a segregated endowment fund.

The court believes that the proposal outlined by Georgia–Pacific at the hearing before the Master could be improved upon in a number of ways. However, it is clear that the plaintiffs chose not to participate in the outline of the program and thus Georgia–Pacific was not assisted in anyway in the preparation of the outline for the scholarship program. For that reason, the court will direct the parties to confer and submit to the court within **thirty days** an agreed scholarship program utilizing Georgia–Pacific Foundation as the administering agency. The court believes that counsel, once they are apprised of the court's ruling on the disposition of the funds, will be able to amicably work together to design a program that will best serve the interests of the class members.