In re **FOLDING CARTON ANTITRUST LITIGATION.**

No. MDL 250.

United States District Court, N.D. Illinois, E.D.

Feb. 17, 1983.

Eugene Warlich, Doherty, Rumble & Butler, St. Paul, Minn., for Land O'Lakes, Hartz Mountain.

Douglas Rigler, Foley, Lardner, Hollabough & Jacobs, Washington, D.C., for G. Heileman.

Thomas R. Meites, Chicago, Ill., for Beatrice.

Harold E. Kohn, Philadelphia, Pa., for Cumberland Farms, Food Fair.

W. Donald McSweeney, Richard J. Hoskins, Schiff, Hardin & Waite, Chicago, Ill., for Federal Paperboard Co.

Irving H. Goldberg, Jenner & Block, Chicago, Ill., for Champion Intern.

Henry L. King, Davis, Polk & Wardwell, New York City, Ned Robertson, Mayer, Brown & Platt, Chicago, Ill., for Intern. Paper.

Alan Wiseman, Howrey & Simon, Washington, D.C., for Mead Corp.

Roger Harris, Altheimer & Gray, Chicago, Ill., for Alton Boxboard.

Lowell E. Sachnoff, Sachnoff, Weaver & Rubenstein Ltd., Chicago, Ill., for Grist Mill.

Before ROBSON and WILL, District Judges.

## MEMORANDUM OPINION

The folding carton antitrust litigation involved an alleged conspiracy on the part of the various defendants, all manufacturers of folding cartons, to fix prices in violation of the Sherman Act. Among the civil cases consolidated in this district for pretrial proceedings, see 28 U.S.C. § 1407, were several nationwide class actions on behalf of a certified class of direct purchasers of various

types of folding cartons. On September 19, 1979, prior to trial, the class actions settled. The settlement was the result of a so-called "global agreement" under which all defendants contributed a total amount of roughly $200,000,000 to a settlement fund for ultimate distribution in accordance with an agreed-upon "plan of distribution."

In our order approving the settlement—on the basis of our finding that it was fair, reasonable and adequate—we retained jurisdiction "for all purposes related to the administration and distribution of the settlement funds." *See* Pretrial Order No. 60. Although the cases have long been closed, the matter is before us again pursuant to that retained jurisdiction. Several motions have been filed by a few former class members whose claims were paid relating to the disposition of approximately $6 million in the reserve fund established to pay late claims and to meet various expenses and contingencies associated with the distribution of the settlement fund.

Also pending is the motion of two former class members to vacate certain administrative orders approving payments from the reserve fund of attorneys' fees and expenses associated with the administration of the settlement fund. These two former class members, Cumberland Farms Dairy, Inc. and Pantry Pride Enterprises, Inc., also seek, through depositions to be taken pursuant to subpoenas duces tecum, to obtain access to records relating to those fees and expenses.

■ For the reasons which follow, we deny all motions filed by certain former class members and by certain settling defendants for distribution of the reserve fund, either to the former class members and/or to the settling defendants, respectively. We approve the recommendation of the Folding Carton Administration Committee that any reserve funds remaining after all valid claims and expenses have been paid be utilized for research into possible techniques for maximizing competition and preventing or detecting and stopping violations of the antitrust laws or other anticompetitive activity. To that end, we direct the

Committee, subject to our approval as to the charter, by-laws, directors, officers and procedures, to establish a foundation to be called "The Antitrust Development and Research Foundation" and to transfer the interest hereafter earned on the reserve fund to the foundation from time to time as it accrues. Finally, we direct that the remaining principal be transferred to the foundation one year from the date hereof. The Administration Committee is also directed to propose steps to locate former class members who have not previously filed claims and assist them in making properly substantiated claims against the reserve fund. The motion of the former class members Cumberland Farms Dairy, Inc. and Pantry Enterprises, Inc. to vacate administrative orders authorizing payment from the reserve fund of administrative fees and expenses is denied and the subpoenas duces tecum are quashed.

### The Settlement and Distribution

The approximately $200,000,000 settlement of these class actions was, at the time of its approval, unprecedented in amount. The complaints had alleged an ongoing conspiracy on the part of the defendants to fix prices and to conceal the existence of the conspiracy which allegedly spanned the years 1960 to 1974. Billions of dollars worth of purchases of folding cartons were involved. And settlement negotiations—undertaken by appointed attorneys for the plaintiff class with the assistance of the Court—were in progress almost from the beginning of the litigation.

The global settlement which we ultimately approved was the result of separate agreements entered into by attorneys for the plaintiff class with each of the various defendants. Each agreement provided that the settling defendant was to pay its settlement share into an escrow fund, the interest on which was to be retained in the fund; identical Escrow Agreements were entered into with each settling defendant. The settlement papers established no basis for calculating the class members' shares or for distributing the settlement funds and it was

understood at the time that a mechanism for pro rata distribution based on class members' purchases would have to be developed. The parties agreed, and we ordered, that no distribution of the funds be made without an order of Court.

The Escrow Agreements recited that the settlement funds were "irrevocabl[y]" transferred for the purpose of satisfying the defendants' possible liabilities and that the defendants had the right to return of the deposited funds only in the case of termination or invalidity of the settlement. Paragraph 11 of the Escrow Agreements— the only paragraph in the Agreements regarding defendants' possible future interest in the fund—provided:

> No Settling Defendant shall have any right, title or interest to any portion of the principal or interest of the Fund until such time as such Settling Defendant, pursuant to the settlements and this Agreement, shall receive return of its contribution to the Fund upon withdrawal from or termination of the Settlements.

None of the contingencies which would have generated an interest of the settling defendants in the escrow funds ever materialized.

The proponents of the settlement, representatives of the plaintiff class, formulated and proposed a plan of distribution of the settlement fund which they submitted together with their memorandum in support of the proposed settlement. The plan of distribution, to which we agreed, was described in the following terms:

> Plaintiffs propose that the distribution to class members be made on a claims made basis. Each participating class member would be required to submit a claim to the Court for approval which would consist of its highest four years of folding carton purchases from defendants during the 1960–1974 period. Record substantiation would be required for each claim, except that where records for less than four years exist an estimate could be provided for the missing years. . . . Each claimant will recieve [sic] a share of

the Fund based upon the claimants' allowed purchases as they relate to the Fund, after deduction of attorneys' fees, costs, administration expenses and reserves ordered by the Court.

Memorandum of Class Plaintiffs in Support of The Proposed Settlements and Proposed Plan of Distribution at 69.

As an appendix to their Memorandum in Support of the Settlement, the class attorneys suggested a form of Notice of Hearing on the proposed settlement and plan of distribution. We approved the form and, prior to the September 13, 1979 hearing on the adequacy of the settlement, *see* Fed.R. Civ.P. 23(e), that form together with an approved claim form was forwarded to all the putative members of the plaintiff class. The recipients of these materials were approximately 6,000 direct purchasers of folding cartons who could be identified from defendants' customer and sales lists.

The class notice described the approximate amount of the settlement and the plan of distribution. In pertinent part it provided:

> Subject to Court approval, proposed settlements in the aggregate principal amount of $199,616,051 have been reached with all of the defendants in the case. Inclusive of interest, it is estimated that the Fund will be $218 million as of January 2, 1980. These figures are before any deduction for attorneys' fees, costs and administrative expenses and reserves which may be ordered by the Court.

> \* \* \* \* \* \*

THE PROPOSED PLAN OF DISTRIBUTION OF THE SETTLEMENT FUND. On July 9, 1979, plaintiffs submitted to the Court a proposed Plan of Distribution of the Settlement Fund. This proposed Plan of Distribution has been approved by all of the active class representatives and their attorneys, and has been preliminarily approved by the Court subject to modification or final approval after the hearing commencing on September 13, 1979. The proposed Plan of Distribution provides that:

(a) All class members desiring to participate in the Fund must submit their claims on the Claim Form which accompanies this Notice.

\* \* \* \* \* \*

(c) The allowed claims of all class members will be totalled.

(d) Each claimant will receive a share of the Fund based upon the claimant's allowed purchases for any four years from 1960 to 1974 inclusive, as they relate to the Fund, after deduction of attorneys' fees, costs, administrative expenses and reserves ordered by the Court as more fully described in the Claim Form which accompanies this Notice.

The class notice also contained an emphasized waiver provision which stated:

ANY CLASS MEMBER WHO DOES NOT MAKE ITS OBJECTION, IF ANY, TO THE PROPOSED SETTLEMENTS, THE PROPOSED PLAN OF DISTRIBUTION, OR THE ATTORNEYS' FEES, COSTS, ADMINISTRATIVE EXPENSES, AND *RESERVES* IN THE MANNER SET FORTH IN THIS NOTICE, SHALL BE DEEMED TO HAVE WAIVED SUCH OBJECTION. [Emphasis added.]

The attached claim form advised each plaintiff how to estimate the amount of its recovery. It contained the following instructions:

ESTIMATE OF YOUR RECOVERY. For purposes of the computation of your recovery, 'Total Defendants' Sales' shall mean the sum of $4,701,604,000, representing the total sales of folding cartons for the period of 1971–1974 by all of the defendants, and 'Net Fund' shall mean the sum of $199,367,285, representing the estimate of the Fund as of an estimated January 2, 1980 distribution date, including an estimate of interest earned and minus an estimate for attorneys' fees and costs and administrative expenses and reserves. To estimate the approximate amount of your recovery from the proposed settlements, make the following calculation: First, divide your total purchases for the four years shown on the Claim Form by Total Defendants' Sales and then multiply the resulting percentage by the Net Fund. The actual amount of your recovery will vary to some extent from the amount obtained by such calculation as a result of the following factors:

(a) Any particular claimant may submit a Claim Form for four years different than 1971–1974. Therefore, Total Defendant Sales for purposes of the calculation may be more or less than the sum of $4,701,604,000 referred to above.

(b) Certain class members may decide not to submit any Claim Form, which would tend to reduce the amount of Total Defendants' Sales for purposes of the calculation and increase your recovery.

(c) A portion of the claims submitted may be disallowed by the Court upon notice.

(d) On the date of distribution, the Net Fund may be more or less than the estimate of $199,367,285, depending on the actual amount of interest earned to the date of distribution, the valuation of the Federal Paper Company, Inc. notes and warrants, and the actual attorneys' fees, costs, administrative expenses and reserves ordered by the Court.

Prior to the hearing on the settlement, expert opinion was received on the fairness of the proposal. The class plaintiffs' expert estimated that the overcharge attributable to defendants' illegal activity was 3.6% of the selling price on defendants' total sales during the four year period 1971–1974, the period which formed the basis for the settlements. Using the $4.7 billion total sales estimate, total single damages were calculated at $169,200,000. The Court's impartial expert viewed the overcharge rate as approximately 2.6% of the total sales price, yielding an estimated total single damages amount of $122,200,000.

The benefit of the settlement to the plaintiff class is fairly, if rather glowingly, described in the Report of the Folding Carton Fee Committee, an appendix to Pretrial Order 61A, which approved the awards of fees and expenses to the plaintiff class attorneys. The Pretrial Order and its appen-

dix are reported at *In re Folding Carton Antitrust Litigation,* 84 F.R.D. 245, 254 (N.D.Ill.1979):

> The settlement was the largest dollar settlement in the history of class action litigation at the time it was made, and is the highest [antitrust] settlement ever achieved as a percentage of single damages, *i.e.,* 118% [of the estimated damages to the total class]. Compared to settlements approved as fair, adequate and reasonable in other cases the result is outstanding. For example, in *Newman v. Stein,* 464 F.2d 689 (2d Cir.1972), the Court approved a settlement representing 14% of potential recovery; in *City of Detroit v. Grinnell Corp.,* 356 F.Supp. 1380, 1386 (S.D.N.Y.1972), *aff'd,* 495 F.2d 448 (2d Cir.1974), the Court approved a settlement amounting to 9–11% of estimated damages; in *In Re Four Seasons Securities Law Litigation,* 58 F.R.D. 19, 37 (W.D.Okl.1972), the Court approved a settlement of less than 8% of estimated damages; in *Helfand v. New America Fund, Inc.,* 64 F.R.D. 86, 92 (E.D.Pa.1974), the Court approved a settlement of 5% of damage claims filed; in *In Re Sugar Antitrust Litigation,* MDL 201 (N.D.Cal.), the Court approved partial settlements of 30.90%, 54.02%, and 47.90% of estimated damages for four years; in *Dorey Corp. v. E.I. duPont de Nemours and Co.,* 426 F.Supp. 944, 947 (S.D.N.Y.1977), the Court approved a final settlement of approximately 55% of estimated damages; in *Mersey v. First Republic Corp. of America,* 43 F.R.D. 465, 1967–69 CCH Fed.Sec.L.Rep. ¶ 92,304, p. 97, 422 (S.D.N.Y.1968), the Court approved a 5–10% final settlement; and in *In Re Anthracite Coal Antitrust Litigation,* 79 F.R.D. 707 (M.D.Pa.1978), the Court approved a final settlement of 28% of estimated damages for four years.

The $35,000,000 [footnote omitted] offered by defendants on March 24, 1977 to settle this litigation amounted to 20% of single damages and was within the range of settlements approved by other courts, indicated above.

&ast; &ast; &ast; &ast; &ast; &ast;

The amount should also be viewed in the context of the statute of limitations defense, which in antitrust actions is four years. The conspiracy alleged in the complaints terminated in mid-1974. The government indictments were returned in February, 1976. The four year statute, applicable if fraudulent concealment could not be proved for earlier periods, would go back to February, 1972, leaving only approximately two years and nine months vulnerable to damage, [sic] claims, absent fraudulent concealment. The $200 million settlement then can be described as more than 200% of single damages for two years and nine months.

It was clearly understood that the principal amount of the settlement fund—$199,616,051 at the time of our approval of the settlement—was subject to deductions for "attorneys' fees, costs and administrative expenses and reserves which may be ordered by the Court." In fact, however, because of profitable investment of the fund as settlements were reached and added to the fund, the actual amount eventually distributed substantially exceeded the total amount of the individual settlements. The aggregate of fees and expenses which we approved was less than the interest earned on the fund and left a balance of more than $8,000,000 in interest available for distribution in addition to the principal of the settlement fund. Thus, after appointment of an Administration Committee to review the documentation and validity of class members' claims against the fund and after recommendations by that Committee with respect to each submitted claim, distribution of some $206,000,000 in cash and in notes and warrants of one of the defendants was made to over 2,500 claimants who filed claims which were satisfactorily substantiated. Distributions to a total of approximately 75 class members who filed properly substantiated late claims were subsequently made out of the reserve fund as follows: $1,548,909 in September 1980; $298,696 in 1981; and $72,627 in 1982. In all, distribution payments have been made to approximately 2,632 class members who

filed valid claims based on approximately $3.6 billion in purchases, or roughly 77% of the total estimated $4.7 billion in purchases for the relevant period. The figures indicate that 97% of the total available funds, exclusive of class attorneys' fees and costs, were paid to these claimants. Thus, those who filed valid claims have already received 163% of their provable single damages using the plaintiffs' expert's 3.6% damage estimate, or 174% of single damages if the 2.6% damage estimate of the Court's expert is used.

Because of the very large amount in the settlement fund as well as the large number of claims against the fund, the Administration Committee's review and audit of the claims filed was, obviously, a substantial undertaking. The Administration Committee, with our approval, engaged Touche Ross & Co. as accountants to assist in the review and audit of the claims; Analytical Computer Services, Inc. to provide computer services and procedures; LaSalle National Bank to maintain custody of the funds; and Harris Associates to act as investment advisors. Beginning shortly after the approval of the settlement, the Administration Committee, assisted by these technical advisors, began the extensive process of reviewing the submitted claims and conducting individual negotiations with many of the approximately 2,700 class claimants.

As a result of the review, the purchases allowed for purposes of computation of the pro rata shares in the distribution was reduced by over 25%—from over $4,800,000,-000 in claimed purchases to approximately $3,900,000,000 of allowed purchases. Thus, the effect of the review and audit process was to distribute to valid class claimants an additional approximately $54,000,000 of the settlement fund. The Administration Committee was also responsible, with the Court's approval, for investment decisions concerning the fund during the interim between its deposit in escrow and its distribution to those class members who filed properly substantiated claims. And the Committee responded to numerous inquiries and concerns expressed by various claimants with respect to all aspects of the distribution process.

The Administration Committee, with the assistance of the supporting services including the accountants and computer services, expeditiously reviewed claims from approximately 2,700 purchasers of folding cartons, each with innumerable purchases over a four year period. The total amount of the purchases reviewed was almost $5,000,000,-000. Questions were raised with respect to the eligibility of a substantial number of the purchases, conferences and hearings were held, and innumerable allegedly substantiating documents were examined. Approximately 25% of the originally claimed purchases were rejected, with the result that the claimants whose purchases were ultimately approved by us received, as previously noted, their allowable shares of an additional $54,000,000 of the settlement fund. Thereafter, the amount due to each successful claimant was calculated and checks in the appropriate amounts sent to each. Ultimately, checks were sent to some 2,632 class members whose claims were approved in an aggregate amount of approximately $208,000,000. At the same time, the Administration Committee, with the assistance of the investment advisors and subject to our final approval, was responsible for the investment and reinvestment of a fund which ultimately grew, as more settlements were made and interest was earned, to well over $220,000,000 and earned interest over the period at an average rate of 15%. All of this was accomplished at a cost of $1,176,000, slightly over one half of 1% of the fund. The entire operation was so well done that not one appeal was filed from our orders approving either rejection or payment of claims after review of the committee's recommendations.

The Administration Committee has from time to time submitted for our review petitions for reimbursement from the reserve fund for fees and expenses, including those of the accountants, computer services, custodian and investment advisors. By specific Administrative Orders, we have approved, based on our careful review of the submitted petitions, disbursements for at-

torneys' fees, for accounting fees and computer services, and for banking, escrow and investment advisor fees in an aggregate of $1,176,000, in our judgment a very reasonable amount in light of the time spent, the quality of the services performed, and the amounts involved.

Distributees of the settlement fund, per our Administrative Order No. 17, dated April 14, 1980, received, together with their distribution checks, flyers which read as follows:

Enclosed is a check for your distributive share of the Folding Carton Antitrust Settlement Fund. If your check is for an amount greater than $4,000, then you will receive additional distribution from the Settlement Fund in the form of Federal Paper Board Company notes and warrants shortly. If your enclosed check is for an amount of $4,000 or less, then this check includes your fractional share of Federal Paper Board Company notes and warrants, *and is thus in full distribution of your claim to the Settlement Fund.* [Emphasis added]

We ordered on April 22, 1980, that those whose cash payment exceeded $4,000 and who therefore also received notes and warrants of defendant Federal Paper Board Company, receive together with their distribution a notice stating:

The enclosed Federal Paper Board Company notes and warrants represent final distribution of your share of the Folding Carton Antitrust Litigation Settlement Fund . . . . *Your claim to the settlement fund is now fully satisfied.* [Emphasis added]

*See* Administrative Order No. 20. The actual distribution and receipt of these notices occurred shortly after April 22, the date of Administrative Order No. 20.

Pursuant to the settlement agreement, a portion of the settlement fund was allocated to a reserve fund to cover expenses, costs and fees related to the administrative portion of the action, corrections to claims arising after the first distribution and to cover payment of late claims against the fund. Administrative Order No. 10, dated March 6, 1980, which substantially approved the Administration Committee's first distribution recommendation, accordingly directed that the settlement funds remaining in escrow after the distribution be held in escrow and reinvested until further order of Court. As of March 31, 1982—after drawing on the funds to cover payment of the late claims referred to above as well as various administrative expenses, $5,729,550 remained in the fund. That amount has continued to earn interest and the reserve fund is now estimated to be approximately $6 million.

### These Proceedings

As a result of various factors including high investment yield on the settlement fund, exceptionally low per dollar administration expenses and a small and dwindling number of late claims filed, the amount now remaining in the reserve fund is in excess of what the Court or any of the parties to the settlement and distribution originally estimated. It now seems probable that the reserve fund exceeds the amount of any possible future administration costs as well as possible future claims of class members, although we note that if even a fraction of the purchasers who have not heretofore filed claims based on their purchases were to do so and their claims were allowed on the same basis as those of the class members whose claims have previously been paid, the reserve fund would be inadequate. *See* footnote 9, *infra.*

In light of this probability, we face a novel administrative problem—the result primarily of the high income earned on the unprecedented amount involved in this settlement as a result of outstanding investment decisions, fewer late claims and lower administration expenses than anticipated. That problem is how to dispose of the funds remaining on account after defendants have relinquished all right to them and after all claiming class members have been paid substantially more than the aggregate settlements, more than anyone anticipated, and have received notice as provided in the Court-approved settlement and distribution

plan, that no further distribution would be made to them.

Beginning in October 1980, certain of the former claiming class members made inquiries of the Administration Committee and the Court with respect to the disposition of the reserve fund. Motions have now been filed by a comparative handful of the 2,632 class members who filed claims which were allowed, including Hartz Mountain Corporation, G. Heileman Brewing Co., Grist Mill Co., Cumberland Farms Dairy, Inc., Food Fair, Inc. and Beatrice Foods Company, requesting distribution of the excess reserves to those members of the former plaintiff class who have previously been allowed claims against the fund. Various defendants, Mead Corporation, Alton Boxboard Company, Industrial Paper Company, Champion International Corporation and Federal Paper Board Company, have each filed motions arguing in effect that, since members of the plaintiff class who filed claims have been more than adequately compensated and were on notice that they had received their full and final distributions, any amounts in the reserve fund that cannot now be distributed as contemplated in the notice of settlement should be distributed pro rata to the settling defendants.

The Administration Committee has filed briefs supporting distribution of the excess reserves to a not-for-profit educational foundation dedicated to public interest research concerning the effective judicial and legal management of complex and multidistrict litigation, competition and the enforcement of the antitrust laws. Specifically, the Administration Committee suggests that the foundation be responsible for the following undertakings:

1. The research, study and promotion of judicial and legal management of complex and multi-district litigation with particular emphasis on the procedural and substantive aspects of the antitrust laws.

2. The promotion of research, study and implementation of the antitrust laws including, but not limited to the interplay of the federal and state antitrust laws, the federal and foreign antitrust laws, and the antitrust laws and other areas of the law.

3. The payment of late claims for folding carton purchases falling within the class definition for the Folding Carton Antitrust Litigation.

Also before us is a related motion of the former class members, Cumberland Farms Dairy, Inc. and Pantry Pride Enterprises, Inc., purportedly on behalf of themselves and the other claiming former class members, to vacate certain Administrative Orders[1] awarding fees and expenses out of the reserve fund, the ownership of which they also claim. The Administration Committee has filed a brief in opposition to this motion challenging its timeliness and the standing of the two movants to challenge the Administrative Orders. The Administration Committee further contends that the fees and expenses were reasonable in any event.

*The Legal Status of the Reserve Fund*

It is clear that the settling defendants can lay no claim to legal ownership of the reserve fund. The settlement papers signed by each defendant unambiguously provided that the defendants' payments into escrow of their settlement liabilities constituted irrevocable transfers subject only to possible subsequent invalidity or termination of the settlements, contingencies which never occurred. Defendants have not contended that these agreements should now be subject to reformation—an argument for which there appears to be very little basis in any event. *See Beecher v. Able,* 575 F.2d 1010, 1015 (2d Cir.1978); *Haas v. Pittsburgh National Bank,* 495 F.Supp. 815 (W.D.Pa.1980); *see also Pennsylvania R.R. v. United States,* 98 F.2d 893, 894 (3d Cir.1938) (rejecting railroad's con-

---

1. Administrative Orders numbered 4, 6, 7, 9, 16, 21, 23, 24, 26, 28, 34–37, 41, 42 and 46, which are dated between November 2, 1979 and August 24, 1982, are now sought to be vacated.

tention that it was the beneficiary of a "resulting trust" consisting of the unclaimed residue of a judgment fund into which it had paid). The defendants have relinquished any claim to any portion of the settlement fund and therefore lack any possible claim to the reserve fund.

 The bulk of the argument advanced by the several former claiming class members in support of their claim to the reserve fund is that they are legally entitled to "return" of the funds which, they contend, were "erroneously taken" from them. We conclude that the former class members, like the settling defendants, do not have a legal or equitable interest in the fund.

We turn initially to the Administration Committee's argument that the former class members, by failing to object to the settlement and distribution procedure described in the 1979 class notice, have waived any right to object to disposition of the reserve fund. The Committee's position is based on the waiver clause of the class notice, quoted above, which provided that failure to object to the plan of distribution and to the reserves in the manner set forth in the notice constituted waiver of objection. Since no objection was raised to the creation of the reserve fund or to the formula for determining the amount to be distributed to each class member—a formula which was carefully adhered to—the Committee contends all class members have waived any claim to the reserve fund.

It is, of course, accurate that no objection was raised. It is also true that—although there was certainly some probability, as is usually the case in class action distributions, that the reserve fund would contain an excess over all claims and expenses—it did not become clear until two years after the September 1979 hearing on the class settlement how much might be remaining in the fund. Accordingly, the former class members' failure to raise contentions with respect to possible distribution of any excess amounts in the reserve fund may arguably not have constituted a waiver of their right to object to present distribution proposals. Cf. Curtis Publishing Co. v. Butts, 388 U.S. 130, 142–45, 87 S.Ct. 1975, 1984–86, 18 L.Ed.2d 1094 (1967). In any event, while it may well be that former class members whose claims were paid waived any claim to the reserve fund, we will nevertheless consider their contention that they are the legal owners of that fund.[2]

The notice of settlement and the claim form, previously quoted, define the legal entitlement of the class members to the settlement fund. Essentially, the claimants argue that those documents establish that their bargain was for a share—to be determined on the basis of the number and

2. It does not follow, however, that Fed.R.Civ.P. 23 or the Due Process Clause of the Fifth Amendment of the United States Constitution require that notice of these proceedings initiated by a handful of former class members be provided to all former class members, as certain of the movants argue. Federal Rule 23 requires only that notice of dismissal or compromise of class actions, Fed.R.Civ.P. 23(e), be provided.

No one now contends that the 1979 notice of dismissal of these actions was inadequate under Fed.R.Civ.P. 23(e) or the Due Process Clause; it clearly was adequate. See generally Reynolds v. National Football League, 584 F.2d 280, 285 (8th Cir.1978); In re Equity Funding Corp. of America Securities Litigation, 603 F.2d 1353, 1361 (9th Cir.1979). Pursuant to that notice, these actions have been dismissed and all of the claiming class members accepted, without objection, final distribution of their shares of the settlement fund. Since their claims have been dismissed and they have re-

ceived final distribution in accordance with the terms of the approved settlement, the former class members are not entitled to any further notice in this case. Cf. Chlupsa v. Posvic, 113 F.2d 375 (7th Cir.1940) (no class notice necessary prior to entry of post-judgment order permitting defendant's receiver to compromise indebtedness found by money decree).

In any event, we have no doubt that those several former class members who have already appeared and moved for pro rata distribution to them of the reserve fund represent the interests of any of the class claimants. There is no basis for bringing all possible claimants before the Court when their interests will be adequately represented by the class movants who are identically situated. Cf. Hartford Life Ins. Co. v. IBS, 237 U.S. 662, 672, 35 S.Ct. 692, 695, 59 L.Ed. 1165 (1914) (judgment concerning disposition of a mortuary fund binding on non-parties to suit whose interests were adequately represented).

amount of the claims actually filed—of the total settlement fund, less attorneys' fees, costs and reserves held back as insurance against late claims and possible miscalculation in the settlement distribution. They argue that, so long as there remains any amount in the settlement fund which is not necessary to meet the expenses and contingencies for which deductions were anticipated, their claims have not been "fully satisfied" under the terms of the settlement arrangement and they are therefore entitled to the excess funds.

The relevant documents clearly indicate, however, that the basis for the total settlement bargain for each class member was that class member's fractional share alone of total purchases in the relevant period. The claim form did state that "[t]he actual amount of [each class member's] recovery will vary to some extent" from the estimation derived on the basis of share of total purchases, as a result of various factors including, among others, the fact that some purchasers might not file claims. However, the basis for estimation of the recovery and, it must follow, for the class members' entry into the settlement bargain was each claimant's fractional share of total purchases. *See* Claim Form, § 9.

■ We agree with the proposition that the class members were to receive a variable share of the settlement fund. We are unable to concur, however, in the second step of the argument that the entitlement to a variable share amounts somehow to a legal claim on the reserve fund. The uncontrovertible fact is that the bargain has been carried through and the variable shares to which claiming class members were entitled have been fully distributed. In fact, the class members who filed claims established that they made 77% of the relevant purchases but have already received roughly 97% of the settlement fund, a substantial, advantageous variance from the expected and projected terms of the bargain.

We are aware of one fairly close analogy to the situation here and that analogy supports the conclusion we reach. In *In re Vulcan & Reiter Co.*, 162 F.2d 92, 94 (2d Cir.1947), a bankruptcy creditor who had received his share in a creditors' composition sought to obtain funds remaining on deposit in court after distribution to creditors of their composition shares. Even though the amount which the creditor sought to recover was less than the unpaid balance of his original debts, the attempt was unsuccessful. The court concluded—as we conclude here with respect to the former class members—that the creditor had already had the benefit of his bargain and was entitled to nothing more.

Moreover, the former class claimants have already agreed that their claims against the fund have been fully satisfied. Every class member who filed a valid claim against the settlement fund and received a distribution from it was informed that its distributed share was final and represented full satisfaction of its claims against the fund. *See* Administrative Orders 17 and 20. Not a single distributee contested the finality of the distribution to it at that time.[3]

---

**3.** The claiming former class members suggest that second distributions are commonplace in class action litigation that has resulted in the establishment of a settlement fund. However, the cases relied upon for this proposition, *In re Eastern Sugar Antitrust Litigation*, MDL 201A (E.D.Pa.); *In re Cenco*, MDL 291 (N.D.Ill.); *In re Equity Funding Corp. of America Securities Litigation*, MDL 142 (C.D.Cal.); *Mary Green v. Occidental Petroleum Corp.*, Civ. 71–591 RJK (C.D.Cal.), all involved a prior understanding that subsequent distributions would be made.

In *Eastern Sugar*, the first distribution notified claimants that they had received 80% of what they were entitled to. In *Mary Green*, the order authorizing the distribution stated that each claimant would receive 50% of its claim in the first distribution and 50% in the second. In *Equity Funding*, approximately 20% of the settlement funds were held back during the first distribution for the benefit of so-called "settlement fund B" group claimants. In *Cenco*, the "second distributions" were distributions of additional settlements received; it was understood that the "first distribution" represented only a partial settlement of the action. No additional settlements were made and no additional funds were received in the instant case after the plan of distribution was approved.

Accepting the argument that the former class members are now legally entitled to "return" of the reserve fund would compromise the important policy of finality in class action distributions. The clear intent of Administrative Orders 17 and 20, as well as that of the allocations to the reserve fund, was to avoid prolonging and complicating the settlement distribution process. The finality of the distributions was clearly and unambiguously expressed in order to protect all of the parties concerned and to reduce the costs of settlement administration. We will not disregard the clear and unequivocal understanding that the distributions to the claiming class members were final distributions which extinguished their claims to the settlement fund.

The claimants emphasize that the class was a group of approximately 2,632 whose identities and pro rata shares of the settlement are known and that distribution of the $6 million to them could be accomplished efficiently and at relatively moderate expense. Those facts do not, however, establish the right of any or all of them to the reserve fund. The fact that further distribution to them would not be a complicated process and that the reserve fund would not necessarily be exhausted in the process of a further distribution to the already well compensated former class members provides no legal basis for upsetting the finality of the settlement distribution.

It may be noted in passing that counsel for the plaintiff class have also been well compensated for their services to the class, having received, with our approval, approximately $13,500,000. To the extent that they would share in any further distribution to clients who were members of the class, and we are aware that most of them had contingent fee agreements with clients who were class members since we took those agreements into account in awarding fees, they would be excessively compensated. Those counsel who were not compensated from the settlement fund have, we assume,

been paid by their clients for whatever services they may have rendered, whether under contingent fee agreements or otherwise. Since all counsel who represented the class and performed the services which generated the settlement fund have received full compensation for their services, there would appear to be no justification for further compensation to any attorneys whether class counsel or not.

All of the movants before us appear to agree that the members of the plaintiff class who did not file claims have no legal interest in the reserve fund. These absent class members—whatever may be their equitable status—failed to file timely claims against the settlement fund. Although it was within our discretion to allow their late claims,[4] a procedure to which no one has objected in any event, the non-claiming class members clearly have no present legal ownership interest in the fund. *See, e.g., Illinois Bell Telephone Co. v. Slattery,* 102 F.2d 58, 66–67 (7th Cir.1939); *In re General Motors Corp. Engine Interchange Litigation,* 594 F.2d 1106, 1135 n. 51 (7th Cir.) (dicta), *cert. denied,* 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979).

■ We have also considered the possibility that the reserve fund may have escheated either to the State of Illinois or to the United States government. The statutes which would govern that event are inapplicable by their terms, however. The federal statute, 28 U.S.C. § 2042, applies only where "money" has been "deposited in court" for at least five years and the right to the money "has been adjudicated or is not in dispute." Five years has not elapsed, these funds have not been "deposited in court" and the right to them is hotly contested. Similarly, Ill.Rev.Stat. ch. 141 §§ 101, *et seq.,* vests no interest in the state until property held "in a fiduciary capacity," Ill.Rev.Stat. ch. 141 § 107, or by a court, Ill.Rev.Stat. ch. 141 § 108, has gone unclaimed for a period of seven years.

---

4. Payments to late claimants were also made without discussion or objection in *State of West Virginia v. Chas. Pfizer & Co.,* 314

F.Supp. 710 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079 (2d Cir.), *aff'd,* 404 U.S. 548, 92 S.Ct. 731, 30 L.Ed.2d 721 (1971).

### Equitable Considerations

We recapitulate: the settlement agreements and the plan of distribution in these lawsuits might have provided for "recapture" of excess reserves by the settling defendants; they might also have provided for a supplemental distribution of excess funds to those class members who filed valid claims. In fact, no provision was made for disposition of excess funds remaining in the settlement account either to defendants or to the class members. On the contrary, far from providing for recapture by defendants or supplemental distribution to the already compensated claimants, the clear terms of the settlement and distribution agreements foreclose any legal interest of either group in the reserve fund.

As is clear from the relevant documents, the reserve fund was established primarily as an accommodation to plaintiff class members who failed to file claims in advance of the date set for distribution of the settlement and for payment of administrative fees and expenses which, it was understood, would be substantial. Our minimal[5] allocation to reserves reflected the judgment that every opportunity should be afforded class members who had not filed claims to come forward and collect their rightful share of the settlement. Although a cutoff date for the filing of claims was established, we have consistently paid properly substantiated late claims out of the reserve fund. This was a policy conceived out of fairness to those smaller class members who faced particular difficulties filing or substantiating their claims as well as to those class members who, for whatever reason, might not have had notice of their possible interest in the settlement. *See generally Zients v. LaMorte,* 459 F.2d 628, 630 (2d Cir.1972). No party has ever objected to this practice.

As matters now stand, we are obliged to determine the disposition of a fund, subject to our jurisdiction and control, to which no contender has a legal right: not the settling defendants, who have expressly relinquished any interest in the fund; nor the claiming plaintiffs who have received and acknowledged full satisfaction of their claims against the fund; not their already well compensated counsel; not even the non-claiming former class members who have failed to file timely claims against the fund.

Although the situation with which we are faced is, so far as the size of the reserve fund is concerned, an unprecedented one, we are not wholly without guidance in our resolution of the question. In virtually every class action, there remains a reserve fund after all claims and expenses have been paid. Applying a *cy pres* concept, courts have directed that such funds be turned over to organizations serving the public interest such as law schools, state attorneys general, the American Bar Foundation, the Chicago Bar Foundation, and others. Moreover, it is well recognized that the administration of class actions, particularly of the multidistrict variety, will present novel and unanticipated administrative difficulties. We are admonished to respond with flexibility and imagination. Miller, Problems in Administering Judicial Relief in Class Actions Under Federal Rule 23(b)(3), 54 F.R.D. 501, 510–11 (1972); *see also* Manual for Complex Litigation § 1.43 (1982). That admonition reflects in part the equitable origin of the class action device, *see Hansberry v. Lee,* 311 U.S. 32, 41, 61 S.Ct. 115, 117, 85 L.Ed. 22 (1940); *Montgomery Ward & Co. v. Langer,* 168 F.2d 182, 187 (8th Cir.1948), a setting characterized by innovation consistent with settled principles. 1 Pomeroy, Equity Jurisprudence § 60 (Symons ed. 1941).

The Seventh Circuit, in a case which presented the converse of the problem we face today, adverted to the pivotal role of equitable principles in apportioning class action settlement funds. In affirming the district court's allocation, the court stated:

---

5. Less than 3% of the total settlement was allocated to the reserve fund. At the time of the allocation, the suggestion was made, and rejected by us, that fully 10% of the settlement be allocated to reserves.

[T]he allocation of an inadequate fund among competing claimants is a traditional equitable function, see Chafee, Some Problems of Equity 169–70, 223 (1950)—using equity to denote not a particular type of remedy, procedure, or jurisdiction but a mode of judgment based on broad ethical principles rather than narrow rules. Cf. *Zients v. LaMorte,* 459 F.2d 628, 630 (2d Cir.1972). To make an equitable allocation in this case the judge did not have to resolve trial-type issues of liability and therefore did not have to conduct a trial. He had only to weigh the relative deservedness of Curtiss-Wright and the other class members, and he could do this on the basis of the undisputed facts before him.

*Curtiss-Wright Corp. v. Helfand,* 687 F.2d 171, 174–75 (7th Cir.1982). Faced with the more closely analogous problem of how to dispose of unclaimed portions of settlement funds, courts have the power and the responsibility to exercise equitable discretion to achieve substantial justice in the distribution of the funds. *See Beecher v. Able, supra,* 575 F.2d at 1016; *see also* 3 Newberg, Class Actions § 5620j (1977).

■ As previously indicated, there are three identifiable groups who might lay claims to the reserve fund: the settling defendants, the claiming former class members (and their counsel), and the non-claiming or absent former class members. We turn now to consideration of the "relative deservedness," *Curtiss-Wright Corp., supra,* 687 F.2d at 174, of these groups, a determination which must be informed by the punitive and compensatory policies of the antitrust laws, the wrongdoing or "unclean hands" of each group and the extent to which each has been compensated for any actual injury it may have suffered. *Cf. United States v. Morgan,* 307 U.S. 183, 194, 197–98, 59 S.Ct. 795, 801, 802, 83 L.Ed. 1211 (1939) (court of equity, which molds its remedies in light of public policy, should not distribute funds on deposit until claimants'

relative entitlements have been determined).

■ The overriding Sherman Act policy of deterring price fixing violations—conduct for which many of these defendants or their officers had previously been criminally convicted—is the most important factor in assessing the defendants' possible equitable entitlement to the reserve fund. That policy is beyond question. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 494, 88 S.Ct. 2224, 2232, 20 L.Ed.2d 1231 (1968) (rejecting pass-on defense in part because its application might permit Sherman Act violators to "retain the fruits of their illegality"); *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 745–46, 97 S.Ct. 2061, 2074, 52 L.Ed.2d 707 (1977).

Even the defendants do not argue very strenuously that the reserve fund should be "returned" to them, although they suggest equitable considerations which they assert warrant return of the fund to them in lieu of *cy pres* distribution of the funds. Specifically, they urge that the members of the plaintiff class whose claims were paid have already received compensation far in excess of what anyone anticipated at the time the settlements and plan of distribution were approved and were on notice and acknowledged that they had received their full and final distribution. While we recognize these facts, in light of the Sherman Act policy of deterrence and the defendants' wrongdoing, we reject their equitable claim to the fund. *See Beecher v. Able, supra,* 575 F.2d at 1016; *cf. Hansen v. United States,* 340 F.2d 142, 144 (8th Cir.1965) (no equitable basis for return of illegal rent overcharges).[6]

■ We find almost equally unpersuasive the equitable claim of the claiming former class members (and their counsel) to these funds. The crux of their argument is that because their complaints originally covered an alleged 15 year conspiracy and because

---

**6.** We do not accept the argument of certain defendants that rejecting the claiming former class members' right to these funds would oblige us to "return" them to the settling defendants rather than distribute them in a fashion that would indirectly benefit the entire plaintiff class as well as the general public.

the Sherman Act provides for treble damage recovery, the terms of the settlement do not award them "their [full] out-of-pocket losses." They argue that, even though the final distribution to them in accordance with the agreed-upon plan of distribution has already resulted in their obtaining between 163% and 174% of their estimated single damages ("out-of-pocket losses") for the four year period 1971–74, an additional distribution to them of the reserve fund would only constitute deserved "compensation."

The benefit of the settlement to the plaintiff class has already been the subject of extended briefing and of a hearing in this Court. We approved the settlement on the premise that members of the plaintiff class would recover approximately 118% of their single damages for four of the alleged fifteen years of the price fixing conspiracy—a percentage and amount substantially below that (163%–171%) which the claiming class members actually recovered.

No one could seriously suggest that the settlement, which was unprecedented both in absolute amount and in percentage of alleged single damages recovered, was not an outstanding result from the point of view of the class plaintiffs. See In re Folding Carton Antitrust Litigation, supra, 84 F.R.D. at 254, 268–69. That point has been made repeatedly, not least forcefully by the attorneys for the plaintiff class themselves. See Confidential Memorandum in Support of Proposed Settlements and Plan of Distribution 65–68.

Moreover, it is an economic fact of which we can take judicial notice that the members of the plaintiff class, none of whom were ultimate consumers, in almost every instance had no "out-of-pocket losses" at all. Since virtually all purchasers of fold-

ing cartons were subject to the price-fixing conspiracy here alleged, the probabilities are that most, if not all, of the class members included the total cost of their folding carton purchases in the costs on the basis of which they calculated their profits and then passed those costs and the profit thereon to their customers.[7] While this "pass-on" is no defense so far as the defendants are concerned, see Hanover Shoe, Inc., supra, it is relevant to our analysis of the equitable entitlement of the class members whose claims were paid. We cannot overlook in connection with our equitable analysis the fact that these claimants have already received between 163% and 174% of the estimated overcharges which they paid in the highest four years of their purchases between 1960 and 1974, overcharges which in almost every instance they had already passed on with a profit to their customers.

The claiming former class members' contentions that they have not been properly compensated and are therefore equitably entitled to an additional distribution proceed from the assumption—for which there is absolutely no demonstrated basis—that the class could have recovered treble damages for the entire 15 year period for which a conspiracy was alleged. In fact, use of a four year period for damage estimation may well have worked a benefit to the class plaintiffs who, had they failed to show at trial that the alleged conspiracy was fraudulently concealed, might have recovered for only two years and nine months of alleged overcharges. In re Folding Carton Antitrust Litigation, 84 F.R.D. at 254, 269; and see In re Anthracite Coal Antitrust Litigation, 79 F.R.D. 707, 714 (M.D.Pa.1978). The use of four years in the settlements and in the distribution formula was clearly a reflection of some uncertainties with respect to liability and the period of damages which could be established.

7. The originally certified class in this litigation included both direct and indirect folding carton purchasers. The Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), intervened, prompting decertification of the indirect purchasers. Although the Court in *Illinois Brick* refused to allow indirect purchasers to sue for antitrust injury allegedly passed on to them, the opinion acknowledged that overcharges are in fact passed on—a matter of common knowledge—but that the substantial difficulty of calculating and apportioning such losses should preclude indirect purchasers from consuming judicial resources in attempting to demonstrate them. *See* 431 U.S. at 740–46, 97 S.Ct. at 2071–75.

Moreover, as previously discussed, in measuring the deservedness of the claiming former class members to additional settlement funds—as distinct from what might have been their legal rights had this litigation proceeded through trial on the merits—we may properly take account of the near certainty that they passed on to their customers most, if not all, of the overcharges to which they were subjected. Though they refer to themselves in their briefs as "injured" in the amount of defendants' overcharges, equity must recognize that they may well have suffered actual losses substantially below the amount of those alleged overcharges or, more probably, both recovered any overcharges and enjoyed a profit on them.

The attempt of a few former class members to assert an equitable interest in the reserve fund is rendered anomalous by the simple fact that these claimants and their attorneys have already been more than amply compensated for their diligence in enforcing the antitrust policies of the Sherman Act. In light of the terms of the settlement and the even more generous distribution already made, it is apparent that a further distribution to class members who voluntarily settled their claims for the substantial amount they have already received, would be an undeserved windfall.[8] *Cf. Van Gemert v. Boeing Co.*, 553 F.2d 812, 815–16 (2d Cir.1977) (affirming district court's refusal to redistribute unclaimed portion of securities fraud judgment among those who had already appeared and collected their share).

In contrast, the equitable claim on these settlement funds of the non-claiming class members is substantial. They furnished equal consideration for the settlement in this litigation in that their purchases formed part of the base of the various settlements. Moreover, they too are bound by the final judgment. Even though the settlement fund was established for their benefit and, in effect, paid for in part with consideration furnished by them, the non-claiming class plaintiffs have to date received no direct or indirect benefit from the settlement fund. In a related context, the Supreme Court has recently remarked that "members of the class, whether or not they assert their rights, are at least the equitable owners of their respective shares in the recovery." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 481–482, 100 S.Ct. 745, 750, 62 L.Ed.2d 676 (1980) (holding that attorneys' fees could not be paid out of unclaimed recovery in securities fraud case where fund was created by final judgment entered after trial on the merits).

█ What is more, the reserve fund itself was established for the express purpose of benefiting those class members who might appear and file late claims. The conclusion seems unavoidable that those class members who have not come forward to receive their intended benefit have an equitable claim to the reserve fund. It is beyond question that these class members' claims are equitably superior both to those of the settling defendants on account of whose wrongdoing the settlement fund was created and to those of the class members who have already received substantially more than their anticipated share of the fund.

### Disposition of the Fund

The superior equitable claim of the non-claiming class plaintiffs to the reserve fund constitutes the focal point for our deliberations with respect to its proper disposition. Unfortunately, recognition of that superior claim does not resolve the distribution question in this case. The difficulty of distributing the reserve fund fairly among the non-claiming class members is obvious. Although the defendants' purchaser lists, which were used to identify the 35,000 entities who received original notice of the pendency of this litigation and the 6,000 who were notified of the settlement, are still available, their value for determining

---

8. It follows from our conclusion that the claiming former class plaintiffs have neither a legal nor an equitable claim to the reserve fund that we need not solicit them for their consent, as suggested, to contributing a portion of "their share" of the reserve fund to another purpose. *See* Petitioners' Response to the Administration Committee's Surreply 2–3.

the true identity and the share of the absent class members must, realistically, be viewed as limited. Those lists provide no indication of the relative purchases of those who are identified as defendants' customers. The corporate identity of some of those who appear on the lists has changed or may even have terminated, a fact which became apparent in 1979 when we were unable to contact by mail some of those on the lists. And, what is most significant, neither the notice that was mailed to those on the lists nor the wide publicity that this settlement received through the media has yielded properly substantiated claims with respect to nearly 25% of the folding carton purchases for the relevant four year period.[9] More than three years have now elapsed since the approval of this settlement and we must now recognize the reality that we will probably never be able properly to verify all the unaccounted for purchases and purchasers.

The claiming former class members appear to suggest that the relative facility with which these excess funds could be distributed to them should warrant our ruling in their favor. As already noted, we agree that these former class members, who have filed properly documented claims representing 77% of the relevant sales and who have already received pro rata 97% of the settlement, can be easily enough identified for further distributions. However, we do not accept the implication that considerations of expediency should be allowed to obscure the equitable principles that we have analyzed above. Though the claiming former class members can be readily identified and the non-claiming class members cannot, the "relative deservedness" of the latter group is obvious.

The position of the Administration Committee, which we accept in principle, is that we should do the best we can, under the circumstances, to achieve a disposition of the reserve fund which advances the Sherman Act policies pursuant to which settlement fund was created and which—even if indirectly—benefits those absent class members for whom the fund was established. The Committee suggests that we should explore the concepts of *cy pres* or "fluid class recovery" for what guidance they may offer in achieving an equitable disposition.

Essentially, we are urged to apply the proposition—one with equitable origins of its own—that where distribution to the class who should ideally receive a fund is impracticable or inappropriate, the distribution should be made in the "next best" fashion in order as closely as possible to approximate the intended disposition. This is the central concept of both the *cy pres* and fluid class recovery theories—the terms appear to be used interchangeably in the literature, *see* The *Cy Pres* Solution to the Damage Distribution Problems of Mass Class Actions, 9 Ga.L.Rev. 893, 894–95 (1975)—and it is this concept, rather than any possibly tainted label with which we are concerned today. The notion that the unclaimed portion of a class action recovery in particular may be applied *cy pres,* as nearly as possible, to the failed or unachievable purpose for which the recovery was collected, has gained the support of scholars and commentators. *See, e.g.,* Note, 9 Ga.L. Rev. 893 (1975); Comment, Damage Distribution in Class Actions: The *Cy Pres* Remedy, 39 U.Chi.L.Rev. 448 (1972); Jacoby and Cherkasky, The Effects of *Eisen IV* and Proposed Amendments to Federal Rule 23, 12 San Diego L.Rev. 1, 20–27 (1974).

The problem in class action litigation of an unclaimed surplus of funds collected pursuant to settlement is, as the literature and the cases document, a recurrent one. Use of a *cy pres* mechanism is an apparent solution to this problem. At least one antitrust settlement agreement has expressly

---

9. If all of the non-claiming purchasers of the nearly 25% of total purchases were to file valid claims and receive distributions on the same ratio as the class members whose claims were paid, they would be entitled to over $50,000,-000, far in excess of the reserve fund. More-over, some of the late filing claimants whose claims were allowed were paid at a lower percentage rate than those who filed timely claims. The equitable considerations in a further distribution are obviously complex.

provided that the unclaimed surplus, which could have been as much as $20 million, be turned over to certain state attorneys general for use in pro bono projects that would benefit consumers who might have been adversely affected by the defendants' illegal activities. *State of West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710, 728, 733–34 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079, 1084, 1091 (2d Cir.), *aff'd by an equally divided court,* 404 U.S. 548, 92 S.Ct. 731, 30 L.Ed.2d 721 (1971).

We are fully aware that the *cy pres* and fluid class recovery distribution theories have been the subject of controversy. While some courts appear to have endorsed the principle, *see, e.g., Bebchick v. Public Utilities Commission,* 318 F.2d 187, 203–04 (D.C.Cir.) (market distribution of rate overcharge; non-class action), *cert. denied,* 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963); *Daar v. Yellow Cab Co.,* 67 Cal.2d 695, 63 Cal.Rptr. 724, 433 P.2d 732 (1967) (California procedural law); *Simer v. Rios,* 661 F.2d 655, 675–77 (7th Cir.1981) (fluid or *cy pres* distribution proper only where recovery is under a statute embodying policies of deterrence, disgorgement and compensation), *cert. denied,* 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982), others have flatly rejected its validity, *see, e.g., Eisen v. Carlisle & Jacquelin,* 479 F.2d 1005, 1016–18 (2d Cir.1973), *vacated on other grounds,* 417 U.S. 156, 172 n. 10, 94 S.Ct. 2140, 2150 n. 10, 40 L.Ed.2d 732 (1974); *In re Hotel Telephone Charges,* 500 F.2d 86, 90 (9th Cir. 1974); *City of Philadelphia v. American Oil Co.,* 53 F.R.D. 45, 72 (D.N.J.1972).

We do not believe that it is necessary for us to enter this debate. The objections to fluid class or *cy pres* recovery voiced in *Eisen, supra,* and similar cases have centered on the impermissibility of using such recovery to allow an otherwise allegedly unmanageable class action to proceed to trial. In that context, some courts have viewed these recovery mechanisms as inconsistent with Fed.R.Civ.P. 23 and, alternatively, due process. By contrast, we are presented here with what is in effect a *fait accompli:* the class members who filed claims have been substantially compensated yet the reserve fund remains and must be allocated to some appropriate use. We are not now making the determination whether the fund may be established in the first place consistent with the federal rules and the due process clause. *Cf. Beecher v. Able, supra,* 575 F.2d at 1016 n. 3 (defendant may agree to a settlement which provides for fluid recovery notwithstanding the *Eisen* rule).

We are not aware of any judicial opinions dealing with the question whether, after the fact, the *cy pres* distribution mechanism may be used to dispose of unclaimed settlement funds for which there is no legal owner. As previously indicated, we are aware of situations in which it has been applied.[10] In light of the willingness of a number of courts to extend the doctrine to the class action setting and, we must add, in light of the manifest inadequacy of the alternative solutions that have been proposed, we conclude that a *cy pres* approach is the correct one here.

We note that, because this fund already exists, the analogy between this case and the trust law origins of the *cy pres* doctrine is a particularly close one. We have already subject to our control a substantial fund, originally allocated to a reserve in part in order to benefit those members of the plaintiff class who had yet to file their claims, which, it is now apparent, may not fully be put to that intended use. Those who contributed to the fund never had any expectation that it would be returned to

---

**10.** Allocation of the unclaimed residue of a settlement fund to a charitable or pro bono purpose has on previous occasions been made, but never—so far as we are aware—with an opinion. *See, e.g., Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.,* CA No. 71774 SC (E.D.Pa. Feb. 28, 1978) (approximately $25,000 to two law schools to establish loan funds for needy students at those institutions); *State of Illinois v. J.W. Petersen Coal & Oil Co.,* No. 71 C 2548 (N.D.Ill. March 15, 1976) (distribution of one-half of the unclaimed residue to the Chicago Bar Foundation and one-half to the Chicago Lawyers Committee for Civil Rights).

them. Those who filed claims have been fully and well paid. We have the authority to accomplish what may fairly be termed the "general intention" of the allocation to reserves—enforcement of the antitrust policies and benefit to the absent class members—by substituting another purpose which approximates as closely as possible the failed one. *See generally Noel v. Olds,* 138 F.2d 581, 587 (D.C.Cir.1943), *cert. denied,* 321 U.S. 773, 64 S.Ct. 611, 88 L.Ed. 1067 (1944).

We know of no fairer or more equitable way to dispose of the reserve funds than to allocate them to a use which will serve the Sherman Act policies of antitrust enforcement, deterrence and fair competition while providing some indirect benefit not only to the uncompensated members of the plaintiff class, but also to the general public, the ultimate consumers of folding cartons who were really the persons adversely affected by defendants' activities as well as to those class plaintiffs who have already received their final distribution.

The Administration Committee has proposed that the reserve funds be used to establish a tax-exempt foundation whose purposes would be (1) research, study and promotion of judicial and legal management of all complex and multidistrict litigation, particularly antitrust litigation; (2) promotion of research, study and implementation of various aspects of the antitrust laws; and (3) payment of possible future late claims in this case.

█ In principle, we accept the Committee's proposal with the following qualifications: First, we observe that the superior equitable claims of the non-claiming class members to these funds has motivated in part our decision to accept the Committee's proposal. It is essential, in our view, therefore, that prior to full commencement of the foundation's activities, a final effort be made to locate the non-claiming members of the plaintiff class and to assist them in making proper claims against the remaining reserve funds. We therefore direct the Administration Committee to propose steps for our approval to accomplish this. The prin-

cipal of the reserve fund should be held available for a period of one year from the date of this opinion to cover the cost of locating absent class members and of making appropriate payments to them. Any interest accruing after the date of this opinion may be transferred to the foundation. What funds remain undistributed after all possible efforts have been made to locate and substantiate the claims of non-claiming class members may be transferred to the foundation one year from the date hereof.

Second, we note again that the problem of undistributed or surplus funds in class actions and in related contexts is a recurrent one. It should be a high priority of the newly created foundation to explore ways of dealing with this problem while benefiting the maximum number of claimants in these cases.

We believe that the foundation should also include in its purposes consideration of ways to improve competition and to deter or detect and stop anticompetitive activities. It should also include research into the possible forms of notice to class members and the relative effectiveness of different approaches to settlement of complex cases. Finally, we believe that it should include research into the numerous questions that have been raised with respect to the conduct and compensation of counsel in class actions. Subject to these qualifications, we are in agreement with the Administration Committee's proposal. We leave to that body, subject to our approval, the details of forming the foundation and obtaining the proper tax exempt status for it.

### *Motion to Vacate Awards of Fees and Expenses for Settlement Administration*

█ Finally, we turn to the motion of certain former class members to vacate Administrative Orders that awarded attorneys fees and other fees and expenses associated with the distribution of the settlement fund. The challenged orders, the dates of which cover the period November 2, 1979 through August 24, 1982, all provide for awards of fees and expenses out of the same reserve fund in which the former class members have asserted an interest. We have concluded, however, that the former

class members, having received and acknowledged full satisfaction of their claims against the settlement, do not have either a legal or an equitable interest in any reserve funds now remaining on account.

It follows from this conclusion that the former class members have no standing to complain that the unclaimed and unexpended residue of the settlement reserve fund is improperly small. The arguments of those former class members who challenge these Administrative Orders are all founded on the incorrect premise that they have been and are now the owners of the reserve fund. *See* Memorandum in Support of Motion to Vacate Certain Administrative Orders at 4; Reply and Memorandum in Support of Motion to Vacate Certain Administrative Orders at 6. As we have found, however, they lack any interest in the reserve fund and cannot contend that they have been injured in fact by our payment out of that fund of fees and expenses incurred by the Administration Committee and others—even if it were the case that the fees and expenses were unreasonable. *Cf. In re Fine Paper Litigation,* 632 F.2d 1081, 1086–87 (3d Cir.1980) (putative member of a not yet certified class has no standing to object to terms of settlement that do not affect its rights); *and see generally Warth v. Seldon,* 422 U.S. 490, 498–500, 95 S.Ct. 2197, 2204–06, 45 L.Ed.2d 343 (1975).

In any event, it is obvious that the attorneys' fees and expenses authorized by the challenged Administrative Orders were in fact reasonable. The movants correctly point out, as we are well aware, having contributed to their development, that the factors which should guide our discretion in assessing the reasonableness of attorneys' fees have been developed in a long line of authority. In a recent opinion, the Seventh Circuit adverted to eight, possibly overlapping, factors that are contained in the Code of Professional Responsibility of the American Bar Association:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

*Bonner v. Coughlin,* 657 F.2d 931, 934 (7th Cir.1981) (quoting DR 2–106); *see also Lindy Brothers v. American Radiator Corp.,* 540 F.2d 102, 113–18 (3d Cir.1976); *Boggess v. Hogan,* 410 F.Supp. 443 (N.D.Ill.1976); *Liebman v. J.W. Petersen Coal & Oil Co.,* 63 F.R.D. 684 (N.D.Ill.1974).

The Administration Committee's petitions for attorneys' fees incurred in connection with the settlement administration phase of this litigation have been accompanied by contemporaneous time records as well as affidavits listing the hourly rates of the attorneys involved, the time spent and a detailed description of the work. These materials, like all time records filed in connection with attorneys' fees claims in this litigation, were filed under seal for our review.

We carefully reviewed each of the fee petitions when submitted under the standards outlined above and concluded that each petition was properly substantiated as to hours and normal hourly charges and, as adjusted on occasion, was for a reasonable amount in light of the nature and quality of the services rendered, the amounts involved and the benefit conferred on the class.

Nor is there any merit to the contention that the expenses or fees awarded for accounting and analytical services as well as for banking services and investment advice were in any way unreasonable, excessive or duplicative. It was clear to us and to the parties from the beginning that

highly competent technical computer and accounting services would be necessary to achieve a fair distribution of the settlement fund. *See* Transcript of September 13, 1979 Proceedings. The services that have been provided have been of a high quality and at a reasonable cost. We have previously outlined in detail the extensive services performed by the various professionals who made the administration of the settlement fund and its distribution so successful.

Finally, we reject the suggestion that the Administrative Orders are subject to challenge because they were entered without notice to the plaintiff class. A previously quoted notice advised all class members that deductions would be made from the settlement fund to cover administrative expenses and attorneys' fees. Opportunity was provided, with proper notice, for objection to any aspects or features of the proposed settlement, including the attorneys' fees and expenses associated with the settlement, and the creation of the reserve fund and its use for late claims and administrative expenses. No objections were lodged either to the adequacy of the procedures or the notice or to the withholding of a reserve to cover payment of late claims and reasonable fees and expenses associated with the settlement distribution.

The notice that these movants allege they should have received is not required either by the Due Process Clause of the United States Constitution or by Fed.R.Civ.P. 23. In the exercise of our discretion to devise adequate notice procedures in the conduct of class action litigation, we determined that additional notice to all class attorneys of each of the Administrative Orders approving, after careful review, disbursements from the already agreed to reserve fund, in which neither they nor their clients had any legal or equitable interest, would be both unnecessary and wasteful. *See generally Reynolds v. National Football League, supra,* 584 F.2d at 282, 285; *In re Equity Corp. of America Securities Litigation, supra,* 603 F.2d at 1361.

### Conclusion

For the reasons stated above, all motions of former class members whose claims have been paid as well as those of defendants requesting distribution of the reserve fund to them are denied. The Folding Carton Administration Committee is ordered to distribute any interest accruing on the excess reserve funds after the date of this opinion to the Antitrust Development and Research Foundation to be established in accordance with this opinion. The Administration Committee which has so ably handled the fee applications, the investment of the settlement fund, the processing of claims and the distribution of the fund, is to retain the principal of the fund for a period of one year, during which time the Committee will take all possible steps to locate former class members who have not previously filed claims and to assist them in filing proper claims against the fund. One year from the date hereof, the Administration Committee shall distribute any remaining reserve funds to the Foundation.

The motion to vacate certain Administrative Orders awarding fees and expenses incurred in connection with the administration of the settlement fund is likewise denied and the subpoenas duces tecum associated with that motion are quashed.